# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| BUFFALO FIELD CAMPAIGN<br>14365 Hebgen Lake Road<br>West Yellowstone, MT 59758 | Case No. |
| WESTERN WATERSHEDS PROJECT<br>126 S. Main Street, Suite B2<br>Hailey, ID 83333 | **COMPLAINT FOR DECLARATORY<br>AND INJUNCTIVE RELIEF** |
| FRIENDS OF ANIMALS,<br>777 Post Road, Suite 205<br>Darien, CT 06820 | |
| Plaintiffs, | |
| v. | |
| AURELIA SKIPWITH,<br>Director, United States Fish and Wildlife<br>Service,<br>1849 C. Street, N.W.<br>Washington D.C. 20240 | |
| DAVID BERNHARDT,<br>Secretary of the United States Department of<br>the Interior,<br>1849 C Street, N.W.<br>Washington, DC 20240; and | |
| THE UNITED STATES FISH AND WILDLIFE<br>SERVICE, an agency of the United States,<br>1849 C Street, N.W.<br>Washington DC 20240 | |
| Defendants. | |

## INTRODUCTION

1.     Plaintiffs bring this action against Defendants David Bernhardt and Aurelia Skipwith, in their official capacities as Secretary of the Interior and Director of the U.S. Fish and Wildlife Service, respectively, and the United States Fish and Wildlife Service (collectively, "Defendants"), over violations of Section 4 of the Endangered Species Act (ESA), 16 U.S.C. § 1531 *et seq.*, for the September 6, 2019 decision declining to initiate a status review of the distinct population segment (DPS) of Yellowstone bison (*Bison bison bison*). *See* Endangered and Threatened Wildlife and Plants; 90-Day Findings for Three Species, 84 Fed. Reg. 46927, 46930 (Sept. 6, 2019); *see also* Federal Docket No. FWS-R6-ES-2019-0085, 90-Day Finding on Three Petitions to List the Yellowstone Bison as Threatened or Endangered Under the Endangered Species Act (hereinafter, "2019 Negative 90-Day Finding").

2.     In making the 2019 Negative 90-Day Finding, Defendants failed to correct the deficiencies addressed by the district court in *Buffalo Field Campaign v. Zink*e, 289 F. Supp. 3d 103 (D.D.C. 2018) pertaining to the January 12, 2016 decision declining to initiate a status review of the DPS of Yellowstone bison. *See* Federal Docket No. FWS-R6-ES-2015-0123; Endangered and Threatened Wildlife and Plants; 90-Day Findings on 17 Petitions, 81 Fed. Reg. 1368, 1375 (Jan. 12, 2016); *see also* Federal Docket No. FWS-R6-ES-2015-0123, 90-Day Finding on Two Petitions to List a Distinct Population of Yellowstone Bison as Threatened or Endangered Under the Endangered Species Act (hereinafter, "2016 Negative 90-day Finding"). In effect, Defendants continue to apply an improper legal standard.

3.     In making the 2019 Negative 90-Day Finding, Defendants further ignored the plain language of the ESA, which requires that a species be listed as endangered or threatened because of any one of the five factors identified in the ESA and failed to abide by the ESA's directive that such determinations shall be made "solely on the basis of the best scientific and commercial data available . . . ." *See* 16 U.S.C. § 1533(a)(1), (b)(1)(A).

1

4.      Defendants' 2019 Negative 90-Day Finding therefore violated the ESA, 16 U.S.C. § 1531 *et seq.*, and is arbitrary, capricious, and/or contrary to law within the meaning of the Administrative Procedure Act (APA), 5 U.S.C. §§ 701-706.

5.      The Buffalo Field Campaign, Western Watersheds Project, and Friends of Animals (collectively, "Plaintiffs") seek declaratory and injunctive relief reversing, vacating and remanding the 2019 Negative 90-Day Finding for the DPS of Yellowstone bison and directing Defendants to proceed with a full status review for the Yellowstone bison.

## JURISDICTION AND VENUE

6.      The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1346 (United States as a defendant), 28 U.S.C. §§ 2201-2202 (declaratory and injunctive relief), 16 U.S.C. § 1540(c) and (g) (action arising under the ESA citizen suit provision, and the APA, 5 U.S.C. §§ 701-706.

7.      The Court has authority to grant Plaintiffs requested relief pursuant to 28 U.S.C. §§ 2201-2202 (declaratory and injunctive relief), 5 U.S.C. §§ 701-706 (APA), and 16 U.S.C. § 1540(g) (ESA).

8.      Pursuant to the ESA citizen suit provision, Plaintiffs sent Defendants a sixty-day notice of its intent to sue ("Notice") on January 6, 2020. *See* 16 U.S.C. § 1540(g)(2).

9.      Defendants received Plaintiffs' Notice on January 10, 2020.

10.     Defendants responded to Plaintiffs' Notice in a letter dated February 7, 2020.

11.     More than sixty days have passed since Defendants received Plaintiffs' Notice.

12.     Defendants have not remedied the ESA and APA violations. Therefore, an actual controversy exists between the parties.

13.     Venue is proper in this Court pursuant to the ESA, 16 U.S.C. § 1540(g)(3)(A), and 28 U.S.C. § 1391(e) because Defendants reside in the District of Columbia, and Defendants, as officers and employees of the United States, were acting in their official

capacities or under color of legal authority in the events or omissions giving rise to Plaintiffs' claims.

## PARTIES

14.     Plaintiff Buffalo Field Campaign is a nonprofit regional conservation organization that is incorporated and headquartered in the state of Montana. The mission of Buffalo Field Campaign is to stop the slaughter of America's last wild bison, as well as to advocate for their lasting protection, to protect the natural habitat of wild free-roaming bison and native wildlife, and to work with people of all Nations to honor the sacredness of the wild bison. Buffalo Field Campaign's board members, volunteers, supporters, and staff are injured by Defendants' 2019 Negative 90-Day Finding which prevented a twelve-month conservation status review of the Yellowstone bison, a necessary step in listing the species under the ESA. Central to Buffalo Field Campaign's purpose is the daily operation of volunteer patrols along the bison's migration corridors during the fall, winter, and spring. Buffalo Field Campaign's volunteers' direct field experience fosters relationships with the bison and their habitat, which in turn, inspires volunteers to return to the field campaign and become advocates for the bison and the habitat upon which they depend. Without ESA protection, the Yellowstone bison will continue to be harmed and destroyed by the government in their original range and habitat, and the species' habitat will continue to decline and be at risk of loss to further development. Buffalo Field Campaign's board members, volunteers, supporters and staff are injured by Defendants' failure to list the Yellowstone bison under the ESA.

15.     Plaintiff Western Watershed Project is a regional nonprofit environmental conservation organization headquartered in Hailey, Idaho, with offices in Montana, Idaho, Wyoming, Washington, Arizona, Utah, Nevada, Oregon, and California. The mission of Western Watersheds Project is to protect and restore watersheds and wildlife through education, public policy initiatives, and legal advocacy. Without protection under the ESA,

the natural habitat of the Yellowstone bison continues to be used, and effectively decimated, for cattle grazing, while Yellowstone bison are prevented from living in the entirety of their natural range. Western Watershed Project's members and staff are injured by Defendants' failure to list the Yellowstone bison under the ESA.

16.    Plaintiff, Friends of Animals, is a nonprofit international advocacy organization incorporated in the state of New York since 1957. Friends of Animals seeks to free animals from cruelty and exploitation around the world, and to promote a respectful view of non-human, free-living, and domestic animals. Friends of Animals engages in a variety of advocacy programs in support of these goals. Friends of Animals informs its members about animal advocacy issues as well as the organization's progress in addressing these issues though its magazine called *ActionLine*, its website, and other reports. Friends of Animals has published articles and information advocating for the protection of wildlife species so that they can live unfettered in their natural habitats. In the absence of proper protection under the ESA, Yellowstone bison are subject to habitat destruction and curtailment, as well as roundups, capture, and culling that prevent them from roaming freely throughout their range. Friends of Animals' members and staff are injured by Defendants' refusal to list the Yellowstone bison under the ESA.

17.    Plaintiffs sue on behalf of themselves and on behalf of their adversely affected members and supporters. Plaintiffs have invested time and resources to protect bison, including advocating for the conservation of the species, the Yellowstone population segment in particular, and for listing the Yellowstone bison as threatened or endangered under the ESA. In addition, Plaintiffs work to educate their members, supporters, and the public about the status of the species and threats it faces.

18.    Plaintiffs have members and supporters who live near or frequently visit Yellowstone bison habitat in and around Yellowstone National Park and adjacent National Forests. They use public land in and around Yellowstone for recreational pursuits such as

camping, hiking, wildlife viewing, photography, and aesthetic enjoyment. These members seek to view Yellowstone bison throughout their range, and Defendants' refusal to list the Yellowstone bison under the ESA interferes with members' opportunities to do so. In addition to causing irreparable ecological harm to much of the Yellowstone bison's natural habitat, the decision to deny ESA protections for Yellowstone bison will cause direct injury to the aesthetic, recreational, scientific, conservation, educational, and cultural interests that the plaintiff organizations and their members maintain in the continued existence, observation, and study of bison.

19.     The aesthetic, cultural, recreational, scientific, educational, and other interests of Plaintiffs and their members and supporters have been, are being, and, unless the relief requested is granted, will continue to be adversely and irreparably injured by Defendants' failure to comply with federal law and refusal to list the Yellowstone bison as a protected DPS under the ESA. These are actual, concrete injuries to Plaintiffs, caused by Defendants' failure to comply with the ESA and its implementing regulations and policies. These injuries would be redressed by the relief requested in this Complaint.

20.     Defendant David Bernhardt is the Secretary of the Department of the Interior and has ultimate responsibility for the implementation of the ESA, through the U.S. Fish and Wildlife Service, with respect to terrestrial species, such as the Yellowstone bison. The Secretary is also responsible for the actions of his delegate, the U.S. Fish and Wildlife Service, including the delegate's 2019 Negative 90-Day Finding for the DPS of Yellowstone bison. Secretary Bernhardt is sued in his official capacity.

21.     Defendant Aurelia Skipwith is the Director of the U.S. Fish and Wildlife Service, the agency within the Department of the Interior that is charged with implementing the ESA for terrestrial species, such as the Yellowstone bison. The Secretary has delegated administration of the ESA to U.S. Fish and Wildlife Service. 50 C.F.R. § 402.01(b). Director Skipwith is sued in her official capacity.

22.     Defendant, United States Fish and Wildlife Service (FWS), is a federal agency within the U.S. Department of Interior. FWS is responsible for implementing and administering the ESA with respect to terrestrial wildlife, such as the Yellowstone bison.

## STATUTORY AND REGULATORY FRAMEWORK
## OF THE ENDANGERED SPECIES ACT

23.     The ESA is a comprehensive federal statute declaring that endangered and threatened species "are of esthetic, ecological, educational, historical, recreational, and scientific value to the Nation and its people." 16 U.S.C. § 1531(a)(3).

24.     The purposes of the ESA are "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved" and "to provide a program for the conservation of such endangered species and threatened species." *Id.* § 1531(b).

25.     When enacting the ESA, Congress declared that "all Federal departments and agencies shall seek to conserve endangered species and threatened species and shall utilize their authorities in furtherance of the purposes of this Act." *Id.* § 1531(c)(1). Congress further mandated that the Secretary "review other programs administered by him and utilize such programs in furtherance of the purposes of the act." *Id.* § 1536(a)(1).

26.     In order for a species or its habitat to be protected under the ESA, the species must first be listed by the Secretary of the Interior ("Secretary") as either "endangered" or "threatened." *Id.* § 1533. Under the statutory definition, a species is "endangered" if it "is in danger of extinction throughout all or a significant portion of its range." *Id.* § 1532(6). A species is "threatened" under the statute if it "is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." *Id.* § 1532(20).

27.     The Secretary must list a species under the ESA if it is endangered or threatened by any one or more of the following factors: (A) the present or threatened

destruction, modification, or curtailment of its habitat or range; (B) overutilization for commercial, recreational, scientific, or educational purposes; (C) disease or predation; (D) the inadequacy of existing regulatory mechanisms; or (E) other natural or manmade factors affecting its continued existence. *Id.* § 1533(a)(1).

28.     The Secretary's determination regarding whether a species is endangered or threatened must be made "solely on the basis of the best scientific and commercial data available[.]" *Id.* § 1533(b)(1)(A); *see also* 50 C.F.R. § 424.11(b).

29.     The ESA defines the term "species" to include "any subspecies of fish or wildlife or plants, and any distinct population segment of any species of vertebrate fish or wildlife which interbreeds when mature." 16 U.S.C. § 1532(16).

30.     Under the ESA, FWS may list a vulnerable distinct population segment (DPS) of a vertebrate species for protection, even if the species, when taken as a whole, would not be considered threatened or endangered.

31.     FWS's decisions to designate a DPS under the ESA are guided by the joint policy adopted in 1996 by FWS and the National Marine Fisheries Service. *See* Policy Regarding the Recognition of Distinct Vertebrate Population Segments Under the Endangered Species Act, 61 Fed. Reg. 4722 (Feb. 7, 1996) ("DPS Policy").

32.     The listing of an endangered or threatened DPS is intended to be a preemptive measure to "protect and conserve species and the ecosystems upon which they depend before largescale decline occurs that would necessitate listing a species or subspecies throughout its entire range." 61 Fed. Reg. at 4725.

33.     The DPS Policy sets forth the following three elements that are considered in decisions regarding the status of a possible DPS as endangered or threatened under the ESA: "(1) Discreteness of the population segment in relation to the remainder of the species to which it belongs; (2) The significance of the population segment to the species to which it belongs; and (3) The population segment's conservation status in relation to the Act's

standards for listing (i.e., is the population segment, when treated as if it were a species, endangered or threatened?)." 61 Fed. Reg. at 4725.

34.     Under the DPS Policy, a population segment is considered "discrete" if it is "markedly separated from other populations of the same taxon as a consequence of physical, physiological, ecological, or behavioral factors," or is "delimited by international governmental boundaries within which differences in control of exploitation, management of habitat, conservation status, or regulatory mechanisms exist that are significant[.]" 61 Fed. Reg. at 4725.

35.     Under the DPS Policy, if a population is considered discrete, then its biological and ecological significance will be considered. This consideration includes, but is not limited to, the following factors: "(1) Persistence of the discrete population segment in an ecological setting unusual or unique for the taxon; (2) Evidence that loss of the discrete population segment would result in a significant gap in the range of a taxon; (3) Evidence that the discrete population segment represents the only surviving natural occurrence of a taxon that may be more abundant elsewhere as an introduced population outside its historic range; or (4) Evidence that the discrete population segment differs markedly from other populations of the species in its genetic characteristics." 61 Fed. Reg. at 4725.

36.     The DPS Policy recognizes that "it may be appropriate to assign different classifications to different DPS's of the same vertebrate taxon." 61 Fed. Reg. at 4725.

37.     The ESA gives interested persons the right to submit a written petition to FWS to add or remove a species from the endangered species list or change the listed status of a species. 50 C.F.R. § 424.14; *see also* 5 U.S.C. § 553(e).

38.     Within 90 days of receipt of a listing petition, the Secretary must, "to the maximum extent practicable," make an initial finding as to whether the petition "presents substantial scientific commercial information indicating that the petitioned action may be warranted." *Id.* § 1533(b)(3)(A). If the Secretary determines in this "90-day finding" that

the petition does not present substantial information indicating that listing may be warranted, the petition is denied, and the process concludes. The "negative" 90-day finding is then subject to judicial review. *Id*. § 1533(b)(3)(C)(ii). The DPS of Yellowstone bison at issue in this case received such a "negative" or "not substantial" 90-day finding.

39.     The Secretary, by regulation, has stated that a petition is deemed to contain substantial scientific or commercial information if it contains "credible scientific or commercial information in support of the petition's claims such that a reasonable person conducting an impartial scientific review would conclude that the action proposed in the petition may be warranted." 50 C.F.R. § 424.14(h)(i). At the 90-day finding stage, the Secretary does not "subject the petition to rigorous critical review." *See Colo. River Cutthroat Trout v. Kempthorne*, 448 F. Supp. 2d 170, 176 n. 4 (D.D.C. 2006); *see also* 90–Day Finding for a Petition to List the Kennebec River Population of Anadromous Atlantic Salmon as Part of the Endangered Gulf Of Maine Distinct Population Segment, 71 Fed. Reg. 66298, 66298 (Nov. 14, 2006).

40.     Judicial decisions have clarified the appropriate scope and limitations of the Secretary's review of petitions at the 90-day finding stage, in making a determination that a petition presents substantial information indicating the petitioned action "may be" warranted. "As a general matter, these decisions hold that a petition need not establish a "strong likelihood" or a "high probability" that a species is either threatened or endangered to support a positive 90-day finding." Notice of 90-Day Finding on a Petition to List the Caribbean Electric Ray as Threatened or Endangered Under the Endangered Species Act, 79 Fed. Reg. 4877, 4878 (Jan. 30, 2014).

41.     If the Secretary determines that a petition does present substantial information indicating that listing "may be warranted," the agency must publish that finding and proceed with a scientific review of the species' status, known as a "status review." 16 U.S.C. § 1533(b)(3)(A).

42.     Upon completion of the status review, and within one year from the date that it receives the petition, the Secretary must make a "12-month finding" with one of three of three determinations – listing is "warranted"; listing is "not warranted"; or listing is "warranted but precluded" by other pending proposals for listing species, provided certain circumstances are present. *Id*. § 1533(b)(3)(B).

43.     If the Service concludes that listing is warranted in the 12-month finding, the agency must publish notice in the Federal Register of a proposed regulation to list the species as endangered or threatened and take public comment on the proposed listing determination. *Id*. § 1533(b)(3)(B)(ii).

44.     Within one year of publication of the proposed listing rule, the Secretary must publish in the Federal Register the "final listing determination." *Id*. § 1533(b)(6)(A).

45.     If the Secretary concludes that listing is not warranted in the 12-month finding, the petition process is concluded. *Id*. § 1533(b)(3)(B)(i). The not warranted finding is subject to judicial review. *Id*. § 1533(b)(3)(C)(ii).

46.     The information relied upon for final listing decisions should be peer reviewed. *See* Notice of Interagency Cooperative Policy for Peer Review in Endangered Species Act Activities, 59 Fed. Reg. 34270 (July 1, 1994).

## FACTUAL BACKGROUND

**A.    Yellowstone Bison.**

47.     Bison hold a position of paramount importance in American culture and history, as recognized by its 2016 designation as the National Mammal of the United States.

48.     Bison have persisted in North America since the last ice age. They are the largest land animals in the United States with adult males weighing up to, and sometimes exceeding, 2,000 pounds and females weighing up to 1,000 pounds.

49.     Bison live approximately twelve to fifteen years, and feed primarily on grasses and sedges. Bison mate in late July through August and females can give birth to one calf in late April or May.

50.     Bison play an important keystone role in the ecosystems of the Great Plains and American West. Unlike livestock that are confined to one area that mow grasses and other plants down to a uniform height, bison move continuously as they graze. This patchy grazing pattern leaves behind a mosaic of grass heights and habitat structures that provides nesting cover for many prairie-dwelling birds and supports a diversity of plant and animal life. Bison's "wallowing" behavior, in which they roll around and pack down the soil in depressions in the ground, creates natural water pools in the wallows that support a diversity of amphibian life across the landscape. In winter, bison's large heads and shoulders allow them to carve paths through deep snow that are then used as corridors for other animals, including antelope and elk.

51.     Historically, habitat for the wild plains' bison encompassed approximately 2.8 million square miles and numbered in the tens of millions (30 to 75 million). At present, bison occupy less than 1% of their historical range. 76 Fed. Reg. at 10304.

52.     Yellowstone bison suffered similar declines in range. Historically, Yellowstone bison occupied approximately 7,720 square miles within and surrounding the northern Greater Yellowstone area, but have since been restricted to the use of only 15% (1,126 square miles) of their historic range.

53.     By the turn of the 20th century, bison populations consisted of only 500 total animals, with 25 individuals persisting in the Pelican Valley of Yellowstone National Park.

54.     The DPS of Yellowstone bison is regarded as the last remaining population of genetically intact bison in North America. It is one of the last remaining populations in which no evidence has been found of introgression of cattle DNA, and it is the only known herd in the United States to have even partially persisted in its original habitat in the wild.

11

55.    The DPS of Yellowstone bison are unique among other extant conservation herds in that they still exhibit migratory behavior. A significant portion of crucial winter range for Yellowstone bison is located west and north of Yellowstone National Park, on adjacent National Forest lands.

56.    The DPS of Yellowstone bison consists of at least two geographically and genetically distinct subpopulations – the Northern range herd and the Central range herd. Because these herds are separated by large expanses of unsuitable habitat during the breeding season, they remain isolated from each other from a population viability standpoint.

57.    The Northern range herd generally ruts in the Lamar Valley and Mirror Plateau, and migrates in the winter to the northern Park boundary in the vicinity of Gardiner, Montana.

58.    The Central range herd roams between Pelican Valley, Hayden Valley, Mirror Mountain, Firehole River Basin, and Madison Junction, and migrates to winter ranges beyond the north and west boundaries of Yellowstone National Park.

59.    The existence of this population substructure contributes to the maintenance of overall genetic diversity within the Yellowstone bison population.

60.    Yellowstone bison are captured for slaughter inside Yellowstone National Park and killed on National Forest lands. Several American Indian tribes with reserved aboriginal treaty rights and the state of Montana hunt Yellowstone bison migrating onto the National Forest lands.

61.    Migratory bison are entirely prohibited from occupying any range or habitat beyond "Zone 3," an arbitrary regulatory mechanism agreed to by state and federal managers under the Interagency Bison Management Plan (IBMP). Zone management excludes bison from migrating across significant portions of their range.

62.     Climate change could likely drive changes in bison migration that bring them into more conflict with state and federal managers.

63.     Parks with geographically fixed administrative boundaries, such as Yellowstone National Park, face the problem of not being able to "migrate" along with the species they presently protect.

64.     As discussed in a recent study and the Petitions, "[i]t is unclear whether Bison can adapt body size to a 4°C warming within 10 generations by year 2100."

65.     As discussed in a 2010 study and the Petitions, populations of endangered species are unlikely to persist in the face of global climate change and habitat loss unless they number around 5,000 mature individuals or more.

66.     While bison killed at the western boundary line in the vicinity of West Yellowstone come from the Central range subpopulation, those killed at the northern boundary line in the vicinity of Gardiner may originate from either the Central or the Northern range subpopulations.

67.     It is not possible to differentiate between or separate bison from the Northern and Central range herds at the northern Park boundary without using invasive methods, such as permanent identification markers or on-site genetic analysis.

68.     The Central subpopulation is disproportionately impacted by hunting and culling practices in both Gardiner Basin and Hebgen Basin, the northern and western ranges of the migratory herd.

69.     According to a definitive scientific study on bison population genetics, in order to avoid inbreeding depression and maintain genetic variation, each subpopulation should have an "effective population" of 1,000 bison, excluding subadults and other nonbreeding animals and corrected downward for harem-breeding species like bison in which a single dominant male breeds many cows (reducing overall genetic diversity),

which translates to an overall subpopulation size of 2,000 to 3,000 bison in each subpopulation.

70.     The National Park Service estimates that, as of August 2019 (prior to the winter cull), there were approximately 4,829 Yellowstone bison – 3,667 in the Northern herd and 1,162 in the Central herd.

71.     The IBMP currently dominates bison management within Yellowstone National Park and beyond, on National Forest system lands. The IBMP's managing body is comprised of an amalgam of government agencies with differing purposes and mandates: the National Park Service, U.S. Forest Service, U.S. Department of Agriculture Animal and Plant Health Inspection Service, Montana Department of Livestock, and Montana Department of Fish, Wildlife and Parks.

72.     The IBMP was first adopted in the year 2000 after a legal dispute between the state of Montana, the U.S. Department of Agriculture, and the National Park Service regarding the impact of bison management on maintaining Montana cattle producers' "brucellosis-free" status.

73.     A primary purpose of the IBMP is to address the risk of brucellosis transmission from bison to domestic livestock to protect the economic interests of the livestock industry in the state of Montana.

74.     Under the IBMP, bison are intensively managed to protect against the perceived threat of brucellosis from bison, though no cases of such transmission to cattle have ever been documented in the field.

75.     There is no comparable management plan for elk, a native species that harbors brucellosis and yet freely roams the same range where bison are destroyed, despite elk being implicated in transmitting brucellosis to cattle.

76.     The National Academy of Sciences has determined that all transmissions of brucellosis from wildlife to cattle in the Yellowstone ecosystem resulting from contact with elk, not bison.

77.     The IBMP intentionally halts the migrations of Yellowstone bison and subjects them to pressures of artificial selection and domestication. Actions undertaken through the IBMP include the following: hunting Yellowstone bison, capturing migratory Yellowstone bison for slaughter, permanently removing Yellowstone bison to quarantine facilities, and hazing Yellowstone bison off of their habitat on federal, state, and private land.

78.     The population thresholds set forth in the IBMP, which serve as triggers for culling, were not based on a population viability analysis, and do not account for the population substructure of the Yellowstone bison.

79.     According to reports in March 2020, this winter, State and federal officials intend to reduce the Yellowstone bison herds by up to 900 animals pursuant to the IBMP.

**B.      Previous Findings on Petitions to List Bison as Endangered or Threatened Under the Endangered Species Act.**

80.     In 2007, FWS made a finding on Mr. James Horsley's January 5, 1999 Petition to list the Yellowstone bison herds as endangered. *See* Endangered and Threatened Wildlife and Plants; 90-Day Finding on a Petition to List the Yellowstone National Park Bison Herd as Endangered, 72 Fed. Reg. 45717 (Aug. 15, 2007).

81.     In the 2007 finding, FWS concluded there was substantial information that the Yellowstone bison herds may be discrete and significant within the meaning of the DPS Policy, and therefore may constitute a DPS.

82.     In 2011, FWS made a negative 90-day finding on a subsequent Petition to list the wild plains bison or each of four distinct population segments as threatened under the ESA. *See* Endangered and Threatened Wildlife and Plants: 90-Day Finding on a Petition to

List the Wild Plains Bison or Each of Four Distinct Population Segments as Threatened, 76 Fed. Reg. 10299 (Feb. 24, 2011).

83.     On November 13, 2014, Buffalo Field Campaign and Western Watersheds Project submitted a Petition to Defendants to list the Yellowstone bison as a threatened or endangered DPS under the ESA.

84.     On March 2, 2015, Defendants received a second Petition from Mr. James Horsley requesting that the Yellowstone bison be listed as threatened or endangered under the ESA.

85.     The Petitions presented substantial evidence that the Yellowstone bison may be threatened or endangered because its habitat and range has historically been, and continues to be, destroyed, modified, and curtailed.

86.     The Petitions presented substantial evidence that the range of the Yellowstone bison spans an area of approximately 7,720 square miles (20,000 square kilometers) within and surrounding the northern Greater Yellowstone Area but that Yellowstone bison herds are restricted to the use of a 1,226 square miles (3,175 square kilometers) of habitat within the Park, a mere 15% of their historic range.

87.     The Petitions presented substantial evidence that in many years, the Yellowstone bison seasonally attempt to occupy their historic range and migratory routes that stretch beyond the human-defined boundary lines, but that the bison are prevented from doing so because they are hazed back into the Park or killed in accordance with the IBMP to prevent them from accessing their historic habitat, which is used for cattle grazing.

88.     The Petitions presented substantial evidence that the prioritization of the use of federal public lands surrounding Yellowstone National Park as cattle grazing allotments rather than as bison habitat is a present, continuous, and ongoing threat that may endanger the survival and genetic integrity of the DPS of Yellowstone bison.

16

89.     The Petitions provided substantial information that continued culling may degrade the viability of the Yellowstone bison through the loss of genetic heterogeneity and loss of ability to migrate.

90.     The Petitions presented substantial scientific information that continued culling may lead to loss of migratory behavior, which in turn may reduce the overall health and resilience of the DPS of Yellowstone bison.

91.     The Petitions documented that culling can have a differential effect on the two Yellowstone bison subpopulations.

92.     The Petitions provided substantial evidence that indiscriminate hunting and culling are impacting the ability of the DPS of Yellowstone bison to maintain effective subpopulation sizes in at least two ways. First, the Central subpopulation has been disproportionately impacted by IBMP hunting and culling practices. Second, IBMP management practices have brought about adverse demographic changes including differential impacts on cows and bulls and loss of family groups.

93.     The Petitions presented substantial evidence that the DPS of Yellowstone bison may be threatened or endangered due to hunting in the northern and western ranges of migratory bison.

94.     The Petitions presented substantial evidence that the DPS of Yellowstone bison may be threatened or endangered due to culls authorized by the IBMP using traps in the northern and western ranges of migratory bison.

95.     The Petitions presented substantial evidence that the genetic compositions of the Yellowstone bison subpopulations are being altered by the IBMP's selective culling of bison, which may in turn reduce the health, resilience, and defining characteristics of the herds.

96.     The Petitions presented substantial evidence that the Yellowstone bison's Central subpopulation falls significantly short of an effective population size of 1,000, and

that the Northern subpopulation is marginal based on the definition of an effective population size.

97.     The Petitions documented that the IBMP has neglected to conduct a population viability study for the Yellowstone bison to determine the probability of extinction, despite its designation as a high priority research need.

98.     The Petitions presented substantial evidence that the Yellowstone bison may be threatened or endangered as a result of the inadequacy of existing regulatory mechanisms.

99.     The state and federal IBMP is the primary regulatory mechanism impacting Yellowstone bison.

100.     The Petitions presented substantial evidence that the IBMP is a mechanism designed to deplete Yellowstone bison numbers inside and beyond Yellowstone National Park and severely limit bison's migratory range on and beyond National Forest lands, and therefore may threaten or endanger the population.

101.     On January 12, 2016, FWS rejected the Petitions and published a negative 90-day finding refusing to conduct a comprehensive review of the species' conservation status. FWS concluded that the Petitions "do not present substantial scientific or commercial information indicating that the petitioned action may be warranted" under any of the five listing factors. 81 Fed. Reg. at 1375; *see also* Federal Docket No. FWS-R6-ES-2015-0123; 90-Day Finding on Two Petitions to List a Distinct Population of Yellowstone Bison as Threatened or Endangered Under the Endangered Species Act.

**C.     Previous Litigation.**

102.     On September 26, 2016, Petitioners filed suit in the U.S. District Court for the District of Columbia challenging the 2016 Negative 90-Day Finding on several grounds, including that FWS had applied an incorrect evidentiary standard in evaluating the Petitions under Section 4 of the ESA.

103.    On January 31, 2018, U.S. District Judge Christopher R. Cooper issued a decision granting, in part, Petitioners' Motion for Summary Judgment in that action. *Buffalo Field Campaign v. Zinke*, 289 F. Supp. 3d 103 (D.D.C. 2018). Judge Cooper found that FWS had indeed "applied an improper standard when evaluating [the] petition," and, thus acted arbitrary and capriciously in issuing the negative 90-day finding. *Id*. at 105. Accordingly, the court remanded "the case for the agency to conduct a new 90-day finding using the proper standard." *Id*.

104.    On March 16, 2018, FWS received a third petition from Mr. Horsley requesting emergency listing for the DPS of Yellowstone bison.

105.    On May 15, 2019, after FWS failed to comply with its mandatory duties to conduct a proper 90-day finding on the Petitions to list the DPS of Yellowstone bison as endangered or threatened under the ESA, Petitioners again filed suit in the U.S. District Court for the District of Columbia seeking declaratory and injunctive relief requiring Defendants to comply with the ESA and conduct a proper 90-day finding on the Petitions.

106.    On September 6, 2019, FWS issued the 2019 Negative 90-Day Finding at issue in this case. Addressing all three Petitions, FWS found that the Petitions "did not present substantial scientific and commercial information indicating that the petitioned action may be warranted." 84 Fed. Reg. at 46928; *see also* Federal Docket No. FWS-R6-ES-2019-0085, 90-Day Finding on Three Petitions to List the Yellowstone Bison as Threatened or Endangered Under the Endangered Species Act.

107.    In light of the new finding, the parties agreed to dismiss the May 15, 2019 lawsuit.

**D.    2019 Negative 90-Day Finding.**

108.    The 2019 Negative 90-Day Finding concluded that the Petitions presented substantial information supporting a potential designation of Yellowstone bison a single

DPS of the plains bison subspecies but declined to support "further subdividing" the two

subpopulations – the Northern and Central range herds.

109.    The 2019 Negative 90-Day Finding failed to correct the deficiencies

addressed by the district court, and instead, continued to apply an improper legal standard

in making its 90-day determination.

110.    The district court clarified that the agency "must explain why the evidence

supporting the petition is unreliable, irrelevant, or otherwise unreasonable to credit"

rather than simply picking and choosing between contradictory scientific studies. *Buffalo*

*Field Campaign*, 289 F. Supp. 3d at 111-12.

111.    The 2019 Negative 90-Day Finding failed to explain why the evidence

supporting the Petition is unreliable, irrelevant, or otherwise unreasonable to credit and

instead continued to pick and choose between contradictory studies, effectively ignoring

the evidence presented in the Petitions.

112.    The 2019 Negative 90-Day Finding further failed to properly consider

whether the DPS of Yellowstone bison may be endangered or threatened due to habitat

curtailment in all or a significant portion of its range.

113.    It is undisputed that the Yellowstone bison's current range and habitat has

shrunk by nearly 85% as compared to its historical range.

114.    It is also undisputed that the remaining Yellowstone bison's contribution to

the viability of the species is so important that, without the members of that portion, the

species would be in danger of extinction, or likely to become so in the foreseeable future,

throughout all of its range.

115.    Rather than considering that the Yellowstone bison's population across 85%

of its historic range has effectively fallen to zero, and remains that low due to ongoing

efforts to haze, trap, capture, or kill bison, the 2019 Negative 90-Day Finding based the

determination solely on alleged "stable" population numbers within a small fragment of the Yellowstone bison's former range.

116.     Defendants erroneously relied on the estimated "carrying capacity" of Yellowstone National Park in evaluating the threat to the DPS of Yellowstone bison due to range curtailment and habitat loss rather than looking at the ecosystem upon which bison depend for survival in the wild.

117.     For example, Defendants relied on observations recorded during a time when bison were being extirpated across their range in North America to surmise that bison are beyond "carrying capacity."

118.     The 2019 Negative 90-Day Finding further failed to rationally address the threat of overutilization on the DPS of Yellowstone bison. The Petitions present multiple sources of information showing that Yellowstone bison are under significant threat from aggressive overhunting and culling, which is adversely affecting the demographic and genetic makeup of the herds and potentially impairing their future health and viability.

119.     Although the 2019 Negative 90-Day Finding acknowledged that the annual culling and hazing of Yellowstone bison has a significant impact on the subpopulations, it concluded, without any further analysis, that "the population remains stable despite annual culling and is approaching the carrying capacity of [Yellowstone National Park] for bison."

120.     The 2019 Negative 90-Day Finding improperly relies on the IBMP as an adequate source of regulatory protection.

121.     As explained in the Petitions, the management goals of the IBMP, which require a minimum population threshold of only 2,100 bison for both subpopulations collectively, fall short of adequately protecting the Yellowstone bison and do not guard against the deleterious effects of genetic drift, inbreeding, and demographic and environmental stochasticity.

122.    The 2019 Negative 90-Day Finding improperly ignored evidence that a sufficient effective population size of 2,000 to 3,000 per subpopulation must be maintained to avoid inbreeding and loss of genetic diversity in Yellowstone bison.

## CLAIM FOR RELIEF

### (Defendants' 2019 Negative 90-Day Finding for the DPS of Yellowstone Bison Violates the Endangered Species Act and is Otherwise Arbitrary and Capricious)

123.    Plaintiffs herein incorporate all information and allegations contained in the preceding paragraphs.

124.    Defendants' 2019 Negative 90-Day Finding (1) fails to correct the deficiencies addressed by the district court, thereby applying an improper legal standard; (2) fails to properly consider whether the DPS of Yellowstone bison may be endangered or threatened due to habitat curtailment in all or a significant portion of its range; (3) fails to rationally address the threat of overutilization on the DPS of Yellowstone bison due to aggressive overhunting and culling; (4) fails to adequately analyze the foreseeable risk to the DPS of Yellowstone bison due to climate change; (5) improperly relies on the IBMP as an adequate source of regulatory protection; (6) applies incorrect legal standards to the Petitions; (7) ignores the plain language of the ESA that requires FWS to initiate a status review if a petition presents substantial evidence that a species may be endangered or threatened due to one or more of the five factors listed in 16 U.S.C. §1533(a)(1); and (8) is otherwise arbitrary, capricious, and contrary to law in violation of the ESA within the meaning of the APA. 16 U.S.C. § 1533(b); 5 U.S.C. §§ 701-706.

## REQUEST FOR RELIEF

Plaintiffs respectfully request that this Court enter judgment providing the following relief:

A.    Declare that Defendants violated the ESA and/or APA by issuing the unlawful 2019 Negative 90-Day Finding on the Petitions to list the DPS of Yellowstone bison as endangered or threatened;

B.    Vacate the 2019 Negative 90-Day Finding;

C.    Remand the 2019 Negative 90-Day Finding;

D.    Order Defendants to proceed directly to a 12-month status review of the DPS of Yellowstone bison;

E.    Award Plaintiffs' costs, including reasonable attorney fees pursuant to the ESA, 16 U.S.C. § 1540(g)(4), and/or the Equal Access to Justice Act, 28 U.S.C. § 2412; and/or

F.    Provide Plaintiffs such other relief as the Court deems just and proper.


Dated:  March 23, 2020                    Respectfully submitted:

                                          /s/ Michael R. Harris
                                          Michael Ray Harris (D.C. Bar # CO0049)
                                          Director, Wildlife Law Program
                                          michaelharris@friendsofanimals.org

                                          /s/ Courtney R. McVean
                                          Courtney Renee McVean (D.C. Bar # CO0064)
                                          Associate Attorney, Wildlife Law Program
                                          courtney.mcvean@friendsofanimals.org

                                          Friends of Animals
                                          Western Region Office
                                          7500 E. Arapahoe Rd., Suite 385
                                          Centennial, CO 80112
                                          720-949-7791