## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| BUFFALO FIELD CAMPAIGN,<br><br>WESTERN WATERSHEDS PROJECT, and<br><br>FRIENDS OF ANIMALS,<br><br>     *Plaintiffs*,<br><br>v.<br><br>AURELIA SKIPWITH,<br>Director, United States Fish and Wildlife<br>Service,<br><br>DAVID BERNHARDT,<br>Secretary of the United States Department of<br>the Interior, and<br><br>THE UNITED STATES FISH AND WILDLIFE<br>SERVICE,<br><br>     *Defendants*. | Civil Action No. 1:20-cv-798-RDM |

## PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Pursuant to Federal Rule of Civil Procedure 56 and L.Cv.R. 7, Plaintiffs Buffalo Field Campaign, Western Watersheds Project, and Friends of Animals, by and through their counsel, move for summary judgment on all their claims related to the United States Fish and Wildlife Service's September 6, 2019 decision to not undertake a 12-month status review of the Yellowstone bison under the Endangered Species Act. 90-Day Findings for Three Species, 84 Fed. Reg. 46,927, 46,928 (Sept. 6, 2019). This Motion is supported by a Memorandum of Points and Authorities, relevant parts of the administrative record lodged by the Federal Defendants, and the Declarations of Michael Shepard Mease, Joshua Oster and Michael R. Harris in support hereof. Pursuant to L.Cv.R 7(h)(2), no statement of material facts is filed in support of this Motion.

1

For the reasons stated in the Memorandum of Points and Authorities, Plaintiffs respectfully request that this Court grant their Motion for Summary Judgment and deny any cross-Motion for Summary Judgment filed by any other party.

**Plaintiffs request an oral hearing on this Motion.**

Dated: November 16, 2020                    Respectfully submitted,

*/s/ Michael R. Harris*
Michael Ray Harris (DC Bar No. CO0049)
Director, Wildlife Law Program
Friends of Animals
7500 E. Arapahoe Road, Suite 385
Centennial, CO 80112
Tel: 720.949.7791
Fax: 888.236.3303
michaelharris@friendsofanimals.org

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| BUFFALO FIELD CAMPAIGN, | |
| WESTERN WATERSHEDS PROJECT, and | |
| FRIENDS OF ANIMALS, | |
| *Plaintiffs*, | |
| v. | Civil Action No. 1:20-cv-798-RDM |
| AURELIA SKIPWITH,<br>Director, United States Fish and Wildlife<br>Service, | |
| DAVID BERNHARDT,<br>Secretary of the United States Department of<br>the Interior, and | |
| THE UNITED STATES FISH AND WILDLIFE<br>SERVICE, | |
| *Defendants*. | |

**MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

INTRODUCTION..................................................................................................................1

LEGAL BACKGROUND: THE ENDANGERED SPECIES ACT LISTING PROVISIONS AND
EVIDENTARY STANDARDS ..........................................................................................3

FACTUAL BACKGROUND ................................................................................................5

   A.  The Yellowstone Bison and its Near Extinction.........................................................5

   B.  Current Threats to Survival of Yellowstone Bison. ...................................................7

   C.  The Listing Petitions: Content, Procedural History, and the 2017/18
      Litigation and Remand. .......................................................................................... 10

SUMMARY JUDGMENT STANDARD ........................................................................... 13

ARGUMENT ...................................................................................................................... 14

   A.  FWS's 2019 Finding is Arbitrary and Capricious Because it Failed to Review
      and Consider a Substantial Amount of the Scientific Evidence Presented in
      the 2014/15 Petitions. ........................................................................................... 14

   B.  FWS's 2019 Finding is Arbitrary and Capricious Because it Failed to Correct
      the Deficiencies in The 2016 Finding Found in *Buffalo Field Campaign v.*
      *Zinke*.................................................................................................................... 17

      1.  FWS unlawfully attempted to resolve disagreements among reasonable
         scientists regarding whether the Yellowstone bison DPS is comprised of
         two subpopulations. ....................................................................................... 19

      2.  FWS unlawfully attempted to resolve disagreements among reasonable
         scientists regarding whether a 3,000-bison population target is sufficient
         to ensure survival of the Yellowstone bison DPS................................................ 24

   C.  The Petitions Present Substantial Scientific or Commercial Information that
      Listing the Yellowstone Bison DPS May Be Warranted. ......................................... 27

      1.  The Yellowstone bison DPS is endangered or threatened in its current
         range due to substantial loss of historic habitat and range........................... 27

      2.  The 2019 Finding erroneously relied on the carrying capacity of the
         Yellowstone National Park. .......................................................................... 30

      3.  FWS's conclusion that the IBMP may be an adequate source of regulatory
         protection is contrary to the evidence provided in the Petitions.................................. 35

      4.  The Petitions present substantial information that Yellowstone bison are
         threatened by hunting and culling.................................................................. 39

      5.  The Petitions present substantial evidence that the Yellowstone bison
         DPS may be threatened or endangered by climate change............................. 42

CONCLUSION AND REMEDY REQUESTED..................................................................... 43

# TABLE OF AUTHORITIES

## Cases

*Am. Wildlands v. Norton*,
    193 F. Supp. 2d 244 (D.D.C. 2002) ................................................................................... 15

*Bar MK Ranches v. Yuetter*,
    994 F.2d 735 (10th Cir. 1993) ........................................................................................... 15

*\*Buffalo Field Campaign v. Zinke*,
    289 F. Supp. 3d 103
    (D.D.C. 2018) ................................................................... 2, 4, 11, 12, 17, 18, 19, 24, 25, 27, 33, 41

*Carlton v. Babbitt*,
    900 F. Supp. 526 (D.D.C. 1995) ................................................................................ 3, 29, 41

*Citizens to Preserve Overton Park, Inc. v. Volpe*,
    401 U.S. 402 (1971) ........................................................................................................... 14

*Coe v. McHugh*,
    968 F. Supp. 2d 237 (D.D.C. 2013) ................................................................................... 13

*\*Colo. River Cutthroat Trout v. Kempthorne*,
    448 F. Supp. 2d 170 (D.D.C. 2006) .............................................................................. 17, 44

*Crow Indian Tribe v. United States*,
    965 F.3d 662 (9th Cir. 2020) ........................................................................................ 35, 39

*Ctr. for Biological Diversity v. Kempthorne*,
    No. C 06-04186 WHA, 2007 WL 163244
    (N.D. Cal. Jan. 19, 2007) ................................................................................................... 18

*Ctr. for Biological Diversity v. Kempthorne*,
    No. CV 07-0038-PHX-MHM, 2008 WL 659822
    (D. Ariz. March 6, 2008) .................................................................................................... 18

*\*Ctr. for Biological Diversity v. Morgenweck*,
    351 F. Supp. 2d 1137 (D. Colo. 2004) ................................................................ 15, 17, 18, 44

*Ctr. for Biological Diversity v. Zinke*,
    900 F.3d 1053 (9th Cir. 2018) ...................................................................................... 27, 28

*Defs. of Wildlife v. Babbitt*,
    958 F. Supp. 670 (D.D.C. 1997) ........................................................................................ 41

*Defs. of Wildlife v. Zinke*,
    849 F.3d 1077 (D.C. Cir. 2017) ......................................................................................... 35

*Fla. Power & Light Co. v. Lorion*,
    470 U.S. 729 (1985) ........................................................................................................... 14

*Greater Yellowstone Coalition, Inc. v. Servheen*,
    665 F.3d 1015 (9th Cir. 2011) ........................................................................................... 42

*Humane Soc'y of the U.S. v. Jewell*,
  76 F. Supp. 3d 69 (D.D.C. 2014) ................................................................ 31

*Humane Soc'y of the U.S. v. Pritzker*,
  75 F. Supp. 3d 1 (D.D.C. 2014) .................................................................. 17

*\*Humane Soc'y of the U.S. v. Zinke*,
  865 F.3d 585 (D.C. Cir. 2017) ............................................................. 27, 28

*Hunt v. Wash. State Apple Advert. Comm'n*,
  432 U.S. 333 (1977) .................................................................................... 14

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1972) .................................................................................... 14

*Maritel, Inc. v. Collins*,
  422 F. Supp. 2d 188 (D.D.C. 2006) ........................................................... 15

*Marsh v. Or. Nat. Res. Council*,
  490 U.S. 360 (1989) .................................................................................... 14

*\*Motor Vehicles Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983) ................................... 13, 14, 17, 29, 33, 35, 41, 42, 43

*Occidental Engineering Co. v. Immigration & Naturalization Serv.*,
  753 F.2d 766 (9th Cir. 1985) ...................................................................... 13

*Rempfer v. Sharfstein*,
  583 F.3d 860 (D.C. Cir. 2009) .................................................................... 13

*Richards v. Immigration & Naturalization Serv.*,
  554 F.2d 1173 (D.C. Cir. 1977) .................................................................. 13

*Rocky Mountain Wild v. U.S. Fish & Wildlife Serv.*,
  No. CV-13-42-M-DWM, 2014 WL 7176384
  (D. Mont. Sept. 29, 2014) .......................................................................... 35

*Safari Club Int'l v. Salazar*,
  709 F.3d 1 (D.C. Cir. 2013) ........................................................................ 13

*Wildearth Guardians v. U.S. Sec'y of the Interior*,
  No. 4:08-CV-00508-EJL-LMB, 2011 WL 1225547
  (D. Idaho Mar. 28, 2011) ........................................................................... 15

## Statutes

16 U.S.C. § 1531 ............................................................................................. 3

*16 U.S.C. § 1532 ....................................................................................... 3, 27

*16 U.S.C. § 1533 ................................... 3, 4, 5, 11, 15, 16, 34, 35, 39, 42, 43

5 U.S.C. § 706 ............................................................................................. 2, 13

National Bison Legacy Act,
  114 P.L. 152, 130 Stat. 373 (2016) .............................................................. 5

## Regulations

50 C.F.R. § 424.11 ................................................................................................ 3, 5

50 C.F.R. § 424.13 ................................................................................................... 5

*50 C.F.R. § 424.14 ...................................................................................... 4, 16, 17

## Rules

Fed. R. Civ. P. 56 ................................................................................................... 13

L.Cv.R 7 ................................................................................................................ 13

## Legislative Material

H.R. Rep. No. 95-1625 (1978),
    *reprinted in* 1978 U.S.C.C.A.N. 9453 .......................................................... 5

H.R. Rep. No. 97-567 (1982),
    *reprinted in* 1982 U.S.C.C.A.N. 2807 .......................................................... 5

## Federal Register

12-Month Finding on Two Petitions to Delist the Preble's Meadow
    Jumping Mouse,
    78 Fed. Reg. 31,679 (May 24, 2013) ......................................................... 23, 24

90-Day Finding for a Petition to Delist the Preble's Meadow Jumping Mouse
    in Colorado and Wyoming and Initiation of a 5-Year Review,
    69 Fed. Reg. 16,944 (Mar. 31, 2004) ............................................................. 23

90-Day Finding on a Petition To List the Saltmarsh Topminnow as
    Threatened or Endangered Under the Endangered Species Act,
    76 Fed. Reg. 49,412 (Aug. 10, 2011) ............................................................ 4, 5

Environmental Impact Statement for a Management Plan
    for Yellowstone-Area Bison,
    80 Fed. Reg. 13,603 (Mar. 16, 2015) .............................................................. 37

*Final Policy on Interpretation of the Phrase "Significant Portion of Its Range"
    in the Endangered Species Act's Definitions of "Endangered Species"
    and "Threatened Species,"
    79 Fed. Reg. 37,577 (July 1, 2014) ............................................................ 27, 28

Revisions to the Regulations for Petitions,
    81 Fed. Reg. 66,461 (Sept. 27, 2016) ............................................................. 16

## Other Authorities

*Carrying capacity*, Biology Online,
    https://www.biologyonline.com/dictionary/carrying-capacity
    (last visited Nov. 16, 2020) ........................................................................... 30

Interagency Bison Management Plan Members, *Memorandum*,
   IBMP (Dec. 31, 2019),
   http://ibmp.info/Library/OpsPlans/2020_IBMP_Winter_Operations_Plan_Final.pdf ........ 8

Natalie D. Halbert *et al., Yellowstone Bison Genetics: Let Us Move Forward*,
   103 J. Hered. 754, 754-55 (2012),
   https://doi.org/10.1093/jhered/ess051 ............................................................................ 21

\* Authorities chiefly relied upon are marked with an asterisk.

## INTRODUCTION

Millions of wild bison once roamed North America from the Northern Rockies to the Great Plains. Today, a few thousand free-roaming bison live in and around Yellowstone National Park. These Yellowstone bison are the only significant herd of bison with no evidence of hybridization with cattle, thus representing a genetically important population. Sadly, the Yellowstone bison are only dwindling in numbers due to human mismanagement and have been extirpated from at least 85% of their historic range.

Yellowstone bison are managed under the Interagency Bison Management Plan ("IBMP"), which marks a return to the early days of active animal husbandry within Yellowstone, albeit with slightly larger population numbers. The primary motive underlying the creation of the IBMP was to protect Montana ranchers' financial interests, not to conserve the Yellowstone bison. The Yellowstone bison's territory extends outside Yellowstone National Park. However, the IBMP restricts the bison's natural range though hazing, hunting, capture, and slaughter of bison that migrate to their natural range beyond the Park boundaries, thereby curtailing their current range and prohibiting the bison from re-occupying their historic range. The IBMP has enabled the slaughter of thousands of Yellowstone bison, sometimes wiping out over a third of the existing Yellowstone bison population in a single season. Today, Yellowstone bison are imperiled by overutilization, restrictions in their range, climate change, and inadequate regulatory mechanisms.

Recognizing the unique cultural and historic significance of the Yellowstone bison—particularly to Indian Nations—the Buffalo Field Campaign ("BFC"), along with its partners at the Western Watersheds Project ("WWP") and Friends of Animals, has worked tirelessly since the 1990s to monitor the Yellowstone bison herds and protect them from the aggressive over-management, hunting, and culling that had become increasingly intense when the interests of ranchers began to clash with the bison's recovery. Over six years ago, on November 13, 2014, BFC and WWP submitted a petition to the U.S. Fish and Wildlife

Service (FWS or "the Service"[1]) to list the Yellowstone bison as an endangered or threatened distinct population segment (DPS) under the Endangered Species Act (ESA) ("BFC 2014 Petition").

Despite the many threats to the Yellowstone bison, FWS issued a Negative 90-Day Finding on January 12, 2016, rejecting the BFC 2014 Petition ("2016 Finding"). This led to litigation which ultimately resulted in remand back to FWS "to conduct a new 90-day finding using the proper standard." *Buffalo Field Campaign v. Zinke*, 289 F. Supp. 3d 103, 105 (D.D.C. 2018). In that case, Judge Cooper held that FWS applied an improper heightened standard under the ESA at the 90-day stage by attempting to resolve outstanding scientific disputes. *Id.* at 109-111. Judge Cooper found that for FWS to apply the correct standard at the 90-day stage, FWS "must explain why the evidence supporting the petition is unreliable, irrelevant, or otherwise unreasonable to credit rather than simply pick and choose between contradictory scientific studies." *Id.* 109-112.

On September 6, 2019, FWS issued the new Negative 90-Day Finding, but again refused to conduct a comprehensive review of the species' conservation status ("2019 Finding"). This second Finding does not differ substantially from the 2016 one, and again applies an impermissible heightened standard under the ESA by attempting to resolve scientific issues raised in the BFC 2014 Petition.

Accordingly, the BFC, WWP, and Friends of Animals seek judicial review of the 2019 Finding, which must be set aside under the Administrative Procedure Act (APA), 5 U.S.C. § 706, as arbitrary and capricious, an abuse of discretion, and otherwise not in accordance with the law.

---

[1] The term "FWS" will be used in this brief to refer to all Defendants, including the U.S. Fish and Wildlife Service, as this agency acts as an agent of the Secretary of the Interior when making 90-day findings on ESA petitions, and all negative findings are signed and approved by the Director of FWS. *See* USFWS_000404, 001502.

**LEGAL BACKGROUND: THE ENDANGERED SPECIES ACT LISTING PROVISIONS AND EVIDENTARY STANDARDS**

The ESA is a comprehensive federal statute declaring that endangered and threatened species "are of esthetic, ecological, educational, historical, recreational, and scientific value to the Nation and its people." 16 U.S.C. § 1531(a)(3). The purposes of the ESA are "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved" and "to provide a program for the conservation of such endangered species and threatened species." *Id.* § 1531(b).

In order for a species or its habitat to be protected under the ESA, the U.S. FWS must first list the species as either "endangered" or "threatened." *Id.* § 1533. Pursuant to the ESA, a species is "endangered" if it "is in danger of extinction throughout all or a significant portion of its range." *Id.* § 1532(6). A species is considered "threatened" if it is "likely to become an endangered species within the foreseeable future." *Id.* § 1532(20). "The term 'species' includes any subspecies of fish or wildlife or plants, and any distinct population segment [(DPS]) of any species of vertebrate fish or wildlife which interbreeds when mature." *Id.* § 1532 (16).

FWS shall list a species if it is endangered or threatened by any one or a combination of the following factors (collectively, "listing factors"): (A) the present or threatened destruction, modification, or curtailment of its habitat or range; (B) overutilization for commercial, recreational, scientific, or educational purposes; (C) disease or predation; (D) the inadequacy of existing regulatory mechanisms; or (E) other natural or manmade factors affecting its continued existence. *Id.* § 1533(a)(1)(A)-(E). FWS shall list a species if it determines that "any one or a combination" of these factors has caused a species to be threatened or endangered. 50 C.F.R. § 424.11(c). FWS must "consider each of the listing factors singularly and in combination with the other factors." *Carlton v. Babbitt*, 900 F. Supp. 526, 530 (D.D.C. 1995).

3

Any interested person can initiate the listing process by filing a petition to list a species. 16 U.S.C. § 1533(b)(3)(A); 50 C.F.R. § 424.14(a). Upon receipt of a listing petition, the ESA requires FWS to make an initial finding known as a "90-day finding" on whether the petition presents "substantial scientific or commercial information indicating that the petitioned action **may be** warranted." 16 U.S.C. § 1533(b)(3)(A) (emphasis added). A petition presents "substantial scientific or commercial information" if it contains credible information in support of the petition's claims such that "a reasonable person conducting an impartial scientific review would conclude that the action proposed in the petition may be warranted." 50 C.F.R. § 424.14(h)(1)(i). Thus, a petition "need not establish a 'strong likelihood' or a 'high probability' that a species is either threatened or endangered to support a positive 90-day finding." 90-Day Finding on a Petition To List the Saltmarsh Topminnow as Threatened or Endangered Under the Endangered Species Act, 76 Fed. Reg. 49,412, 49,413 (Aug. 10, 2011). It is also improper for FWS to resolve an outstanding dispute between reasonable scientists at the 90-day stage. *Buffalo Field Campaign v. Zinke*, 289 F. Supp. 3d 103, 109-11 (D.D.C. 2018). Instead, to apply the correct standard at the 90-day stage, FWS must credit the petition evidence or "explain why the evidence supporting the petition is unreliable, irrelevant, or otherwise unreasonable to credit rather than simply pick and choose between contradictory scientific studies." *Id.* at 112.

A "negative" 90-day finding constitutes a denial of a petition and is subject to judicial review as a final agency action under the standards prescribed by the APA and Section 4 of the ESA. 16 U.S.C. § 1533(b)(3)(C)(ii). If FWS issues a "positive" 90-day finding, concluding that listing may be warranted, then the agency must publish the finding in the Federal Register and commence a "status review" of the species, to be completed within one year, commonly known as a 12-month status review. *Id.* § 1533(b)(3)(A)–(B). During a 12-month status review, FWS will "solicit public comments" and is required to "consult as appropriate with affected States, interested persons and organizations, [and] other affected

4

Federal agencies." 90-Day Finding on a Petition To List the Saltmarsh Topminnow, 76 Fed. Reg. at 49,416; 50 C.F.R. § 424.13. After the completion of the status review, the ESA requires FWS to make a 12-month finding determining whether the petitioned action is in fact warranted. 16 U.S.C. § 1533(b)(3)(B).

ESA listing determinations are to be made solely on the basis of "the best available scientific and commercial information regarding a species' status" and at no point in the ESA listing or delisting process may FWS consider political and economic factors. *Id.* § 1533(b)(1)(A); 50 C.F.R. § 424.11(b); *see also* H.R. Rep. No. 97-567, at 20 (1982), *reprinted in* 1982 U.S.C.C.A.N. 2807, 2820 ("[E]conomic considerations have no relevance to determinations regarding the status of species."); H.R. Rep. No. 95-1625, at 13 (1978), *reprinted in* 1978 U.S.C.C.A.N. 9453, 9463 ("[I]ndividuals charged with the administration of the act do not have the legal authority to weigh the political importance of an endangered species.").

## FACTUAL BACKGROUND

### A. The Yellowstone Bison and its Near Extinction.

Bison hold a position of paramount importance in American culture and history, as recognized by its 2016 designation as the National Mammal of the United States. *See* National Bison Legacy Act, 114 P.L. 152, 130 Stat. 373 (2016). The American bison (*Bison bison*) is the largest native land mammal in North America. USFWS_003318. Two subspecies of American bison are recognized: plains bison (*B. bison bison*), which encompass the Yellowstone bison, and wood bison (*B. bison athabascae*) found in Canada. USFWS_000010, 003315-16.

Millions of bison once roamed across one-third of North America, which for the plains bison spanned 9.4 million square kilometers (3.6 million square miles) and more than twenty unique ecosystems. USFWS_00006, 000011, 003389, 005412. Bison have lost 99% of their range and now live in isolated populations. USFWS_003390. An

approximation based on settlers' accounts suggests Yellowstone bison have lost about 85% of their range and habitat. USFWS_003282.

American bison were driven to the brink of extinction by the arrival of settlers who developed markets for hunting bison, and the "absence of protective measures and agencies on the part of the National Government and of the West States and Territories." USFWS_005481-82, 005836. Industrial-scale hunting eliminated "vast herds of bison on the prairies along the edges of the Greater Yellowstone Ecosystem, including the Yellowstone, Wind, and Snake River drainages." USFWS_005835, 005836. President Grant created Yellowstone National Park in 1872, however, bison in the Yellowstone River valley north of what would soon become Yellowstone National Park were exterminated during the 1860s and eliminated from the Park's northern range by the early 1890s. USFWS_000016, 003124. When "bison everywhere verged on extinction," hunting and poaching "by both the park hotel construction crews and the Cooke City miners" reduced Yellowstone bison to 23 in the wild. USFWS_002968. The few hundred remaining plains bison were captured and sent to zoos or acquired by private ranchers, while small wild groups persisted in scattered areas west of the Mississippi including the Yellowstone bison DPS. USFWS_00006, 000011, 005527-28, 005531-34. This drastic reduction of population size "resulted in the present-day plains bison population being descended from less than 100 founders." USFWS_002637. "In addition, many conservation herds have cattle ancestry" a legacy of ranchers cross breeding bison with cattle in captivity. *Id.*

Yellowstone bison have lived in isolation since the 1902 reintroduction of 18 female bison from the Pablo-Allard herd in Montana and 3 bulls from the Goodnight herd in Texas. USFWS_000016, 002430-31. A majority of the Yellowstone ancestry is likely descended from about 7 effective founders "from the Pablo–Allard and Goodnight herds, which may have reduced overall genetic variation in the Yellowstone herd." USFWS_002643.

The Yellowstone bison DPS is unique because it is well established that the population consists of at least two breeding herds—the Central and the Northern herds. 002092, 002552, 002538-39, 001486-87 (FWS finding that there is substantial information that the Yellowstone bison "may be a DPS, living in a single population with at least two breeding herds" and that "two independent lineages were identified"). However, scientists have also found evidence of "[t]wo genetically distinct and clearly defined subpopulations . . . based on both genotypic diversity and allelic distributions." USFWS_002621, 002538, 003265.

The Yellowstone bison DPS is the only indigenous population of plains bison persisting in a wild state since prehistoric times, with Central and Northern herds occupying ranges in comparable size, "but with different plant communities, precipitation patterns, and densities of elk." USFWS_000008, 003283. Yellowstone bison meet the criteria for discreteness and significance to be recognized as a DPS. USFWS_000025-32. Since the Yellowstone bison DPS is the only significant herd without evidence of cattle ancestry, loss of the population would represent the complete loss of wild plains bison from their last refuge in the United States. USFWS_000025, 002643.

**B. Current Threats to Survival of Yellowstone Bison.**

Yellowstone National Park is located primarily in Wyoming, with a northern border in Montana and a western border in Montana and Idaho, encompassing 9,018 square kilometers. USFWS_003283. Approximately 3,175 square kilometers is principal bison habitat. *Id.* The Custer Gallatin National Forest encompasses more than three million acres in southern Montana, bordering Yellowstone National Park on the west and the north.

The Yellowstone bison's current range and migrations extend to areas outside of Yellowstone National Park, including areas in the Custer Gallatin National Forest and beyond. Both the Northern and Central herds migrate outside the northern boundary lines of Yellowstone National Park during fall, winter, and spring calving. USFWS_000037,

001489, 002349, 004069-72 (maps of seasonal distribution and migration). Additionally, a portion of the Central herd migrates outside the western boundary lines of Yellowstone National Park during fall, winter, and spring calving. *Id.* Following calving season, the bison migrate to rutting territories in the Park. USFWS_001489.

The Yellowstone bison migrating through their natural range outside the Park drew criticism from neighboring ranchers, who were concerned that wild bison could potentially spread brucellosis to their cattle herds, even though there have been no confirmed cases of brucellosis transmission from bison to cattle in the wild. USFWS_003851-52, 000040, 002243. This led to a decade long series of regulatory disputes about bison which resulted in the State of Montana suing the National Park Service. USFWS_003849, 003851-53. The parties eventually reached a settlement with that release of a Record of Decision for the Interagency Bison Management Plan ("IBMP") on December 20, 2000. *Id.*

Under the IBMP, state and federal managers restrict the Yellowstone bison's range by carrying out management actions in "Zones" inside Yellowstone National Park and on the Custer Gallatin National Forest based on a total population target of 3,000 bison. USFWS_003859, 003880, 003855 (map of Zone boundaries on the northern and western ranges); *see also* 001499-50. Yellowstone bison are trapped for slaughter inside Yellowstone National Park in Zone 1, hunted and harassed in government-led hazing operations on National Forests in Zone 2, with state and federal managers enforcing a boundary line in Zone 3 "beyond which bison will not be tolerated."[2] USFWS_005858-61. This intensive management range excludes bison from a substantial portion of their range. *Id.* Additional traps set by the Montana Department of Livestock on National Forest and private lands have further reduced the abundance and distribution of the Central herd

---

[2] Interagency Bison Management Plan Members, *Memorandum*, IBMP, 2 (Dec. 31, 2019), http://ibmp.info/Library/OpsPlans/2020_IBMP_Winter_Operations_Plan_Final.pdf (one of nine objectives of the IBMP operations plan); *see also* USFWS_003967.

bison in their western range. USFWS_003967-69. Hunting, trapping, hazing, capture, and slaughter disproportionately affects the Central herd because it is susceptible to management actions on both the western and northern ranges of the subpopulation's territory. *Id.*; USFWS_000037, 002349. This has caused the Central herd's population to substantially decline since 2006. *Id.* The Central and Northern herds are geographically separated. USFWS_003265. The IBMP does not recognize the Yellowstone bison's unique population substructure and thus has no mechanism in place to mitigate the IBMP's disproportionate effects on the Central herd. USFWS_000042-46.

Instead, the IBMP manages the two Yellowstone bison subpopulations as one population and allows the overall population to decline significantly, below 2,300, before managers "**may**, on a temporary basis . . . increase implementation of non-lethal management," and "**will**, on a temporary basis . . . increase implementation of non-lethal management measures" if the population declines below 2,100. USFWS_003882 (emphases added). The population thresholds set by the IBMP of 3,000, 2,300, or 2,100 bison are insufficient to preserve the genetic diversity of the Yellowstone bison DPS in light of its history of substantial genetic decline, few founders, and subdivision into two genetically distinct subpopulations with geographically distinct migratory patterns and limited genetic exchange between herds. USFWS_000042-44, 002629, 003882. Managers do not recognize genetic substructure, and herd sizes in the Yellowstone bison DPS are below the best available science on minimum viable population sizes to avoid inbreeding and maintain variation. USFWS_000042-46, 002645. Census data has yet to count 5,000 adult individuals that one study in 2010 found as the minimum viable population size necessary to avoid extinction for wild-living species. USFWS_005963, 003969. Disproportionate management effects on the two subpopulations may have dire repercussions for the long-term maintenance of genetic diversity and viability of the Yellowstone DPS that may not be detectable for many years. USFWS_002629. In addition, loss of habitat to human

developments outside the Park is likely to impact wildlife populations within the Park. Migration corridors are forecast to be heavily impacted, the loss of which "would probably reduce gene flow and decrease long-term viability of species isolated within the protected areas of the [Greater Yellowstone Ecosystem]." USFWS_005352.

Bison are regionally extinct in 40 states including Montana, Idaho, and Wyoming, "ecologically extinct within its original range,"[3] a species of concern in Montana, and "imperiled because of rarity or because other factors demonstrably making it very vulnerable to extinction throughout its range." USFWS_001562-63, 002074, 002077. Bison are near threatened and none of the wild herds remaining in North America would persist without "intensive conservation measures." USFWS_001561-62.

**C.  The Listing Petitions: Content, Procedural History, and the 2017/18 Litigation and Remand.**

The fight to protect the Yellowstone bison has been long, as well as unnecessarily protracted by litigation as the government refuses to properly review the ESA petition submitted more than six years ago. On November 13, 2014, the BFC and WWP submitted their petition to list the Yellowstone bison as an endangered or threatened (DPS). *See* USFWS_000001-61. On March 2, 2015, Mr. James Horsley, a private citizen, submitted a petition requesting the same ("Horsley 2015 Petition"). *See* USFWS_000062-390. Collectively, these 2014/15 Petitions present substantial information that the Yellowstone Bison is a DPS that may require listing by FWS as a result of one or more of the criteria in Section 4 of the ESA. *See* USFWS_000001-61, 000062-390.

Under Factor A, "the present or threatened destruction, modification, or curtailment of its habitat or range" the petition presents evidence (1) that the Yellowstone bison are

---

[3] "The role bison historically served in grassland ecosystems disappeared as society killed them to near extinction and usurped most of their habitat for agricultural, recreational, and residential development." USFWS_004114.

extirpation from 85% of their historical range and (2) that the IBMP limits and prohibits the bison from occupying a significant portion of their current range inside and outside of Yellowstone National Park, thereby preventing the bison from re-occupying a significant portion of their territory. 16 U.S.C. § 1533(a)(1)(A); USFWS_000033-37, 001489-90. Under Factor B, "overutilization for commercial [and] recreational . . . purposes," the petition presents evidence of disproportionate over-hunting and culling under the IBMP that may be adversely affecting the demographic and genetic makeup of the herds and potentially impairing their future genetic health and viability. 16 U.S.C. § 1533(a)(1)(B); USFWS_000037, 001492-94. Under Factor C, "disease," the petition presents evidence that "culling is currently conducted [under the IBMP] without adequate regard to possible subpopulation structure and may reduce genetic diversity over the long-term." 16 U.S.C. § 1533(a)(1)(B); USFWS_000039-40, 001494-96. Under Factor D, "the inadequacy of existing regulatory mechanisms," the IBMP goals are insufficient to provide for the conservation of the Yellowstone bison. 16 U.S.C. § 1533(a)(1)(D); USFWS_000041-46, 001498-99. Finally, under Factor E, "other natural or manmade factors affecting its continued existence," the petition presents evidence that genomic extinction and climate change may endanger or threaten Yellowstone bison in the wild. 16 U.S.C. § 1533(a)(1)(E), USFWS_000046-48, 001496-98.

On January 12, 2016, FWS rejected the 2014/15 Petitions, publishing a Negative 90-Day Finding and refusing to conduct a more comprehensive review of the Yellowstone bison's conservation status. *See* USFWS_000391-408; 000409-416. That finding was challenged by the Plaintiffs on September 26, 2016, in this district. On January 31, 2018, Judge Cooper issued a decision remanding the negative finding back to FWS. *Buffalo Field Campaign v. Zinke*, 289 F. Supp. 3d 103 (D.D.C. 2018). Judge Cooper found that FWS had "applied an improper standard when evaluating [the BFC 2014] petition." *Id.* at 105. Judge Cooper specifically held that FWS's attempt to resolve an outstanding dispute between

11

reasonable scientists at the 90-day stage was improper. *Id.* at 109-11. The scientific disputes at issue addressed in the 2018 case were whether the Yellowstone bison DPS consists of two genetically distinct subpopulations and whether the 3,000-bison population target set by the IBMP is sufficient to ensure the survival of the two subpopulations. *Id.* Judge Cooper held that in order to apply the correct standard at the 90-day stage, "the Service must explain why the evidence supporting the petition is unreliable, irrelevant, or otherwise unreasonable to credit rather than simply pick and choose between contradictory scientific studies." *Id.* at 112.

On September 6, 2019, over a year and a half after remand, FWS issued the second Negative 90-Day Finding at issue in this case. Addressing the 2014/15 Petitions, as well as a subsequent petition filed by Mr. Horsley in 2018 (USFWS_000432-756, 000757-1476), FWS found that the Petitions do not "provide substantial scientific or commercial information indicating that listing the [Yellowstone] bison as a DPS of Plains bison (*Bison bison bison*) as a threatened or endangered species may be warranted." USFWS_001499; *see* USFWS_001479-83; 001484-1506. The 2019 Finding however, did find that the Petitions presented substantial information supporting a potential designation of Yellowstone bison as a single DPS of the plains bison subspecies but declined to support "further subdividing" the two subpopulations—the Northern and Central range herds. USFWS_001487.

In reality, FWS's 2019 Finding does not meaningfully differ from its 2016 Finding. For example, in the 2019 Finding, FWS again concluded that the bison do not consist of two genetically distinct subpopulations and that the population target of 3,000 for both herds is sufficient without explaining why the evidence supporting the Petitions was unreliable, irrelevant, or otherwise unreasonable to credit. *See, e.g.,* USFWS_001493; *Buffalo Field Campaign*, 289 F. Supp. 3d at 110-112. In addition, the concerns Plaintiffs raised in the

2018 case regarding the 2016 Finding's treatment of the ESA listing factors are still present in the 2019 Finding. *See generally* Dkt. 1 (alleging same issues raised in the 2018 case).

## SUMMARY JUDGMENT STANDARD

Agency listing decisions under the ESA are reviewed under the standard laid out in the APA. *Safari Club Int'l v. Salazar*, 709 F.3d 1, 8 (D.C. Cir. 2013). Summary judgment is typically appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). However, in cases brought under the APA, 5 U.S.C. § 706, a court need not determine whether there are disputed material facts, because the agency's action is judged against the administrative record, and "the district judge sits as an appellate tribunal." *Rempfer v. Sharfstein*, 583 F.3d 860, 865 (D.C. Cir. 2009) (quotation omitted); *see also* L.Cv.R 7(h), Comment.

In the APA context, summary judgment is the appropriate mechanism for determining, as a matter of law, whether the challenged agency action is supported by the administrative record and otherwise consistent with the APA. *Richards v. Immigration & Naturalization Serv.*, 554 F.2d 1173, 1177 (D.C. Cir. 1977); *see also Coe v. McHugh*, 968 F. Supp. 2d 237, 240 (D.D.C. 2013). The APA directs a reviewing court to hold unlawful and set aside any actions, findings, and conclusions by a federal agency that it finds to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A). An agency's action is arbitrary or capricious if the agency "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicles Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

Review of an agency's decision is generally confined to the record the agency presents to the reviewing court. *See Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743–44 (1985). "[I]n making the factual inquiry concerning whether an agency decision was 'arbitrary or capricious,' the reviewing court 'must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 378 (1989) (quoting *Citizens to Preserve Overton Park, Inc.* v. *Volpe*, 401 U.S. 402, 416 (1971)). The court's inquiry "must 'be searching and careful,' but 'the ultimate standard of review is a narrow one.'" *Id.* At the very least, the agency must have "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *State Farm*, 463 U.S. at 43.

## ARGUMENT[4]

**A. FWS's 2019 Finding is Arbitrary and Capricious Because it Failed to Review and Consider a Substantial Amount of the Scientific Evidence Presented in the 2014/15 Petitions.**

The ESA requires that "[t]o the maximum extent practicable," within 90 days of the petition, FWS must determine whether the petition presents "substantial scientific or commercial information indicating that the petitioned action may be warranted." 16 U.S.C.

---

[4] Plaintiffs' standing has not been challenged in this case. Nonetheless, it is Plaintiffs' burden to establish that: (1) they have suffered an "injury in fact;" (2) the injury is fairly traceable to the challenged action of the defendants; and (3) it is likely that a favorable judicial decision will prevent or redress the injury. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1972). An organization can assert "representational standing" to bring suit on behalf of its members when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit. *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). Declarations from Plaintiffs' members and staff demonstrate standing that FWS's 2019 Finding will cause them injury and a favorable judicial decision will likely redress this injury and prevent further injury. *See* Decl. of Michael Shepard Mease; Decl. of Joshua Oster. Plaintiffs can fully brief this issue if the Court or Defendants dispute such standing.

§ 1533(b)(3)(A). FWS's failure "to consider all of the relevant information" in a petition is arbitrary and capricious because it fails "to give proper consideration to the [p]etition and its attached information pursuant to the 90-day review process." *Ctr. for Biological Diversity v. Morgenweck*, 351 F. Supp. 2d 1137, 1142 (D. Colo. 2004). To meet its "statutory burden for full consideration of an interested party's request to list a species," FWS must base its decision on "the information provided within the four corners of the petition and supplemental materials, the literature cited in the petition, and evaluate[s] that information in relation to other pertinent information available in the FWS files." *Wildearth Guardians v. U.S. Sec'y of the Interior*, No. 4:08-CV-00508-EJL-LMB, 2011 WL 1225547, at *4 (D. Idaho Mar. 28, 2011).

Here, a most unusual situation has arisen since this case was filed. During negotiations between the parties over the proper content of the administrative record, the Federal Defendants willfully admitted that during the review of the Petitions they chose to not consider a significant number of scientific papers cited in the 2014/15 Petitions (and these studies were provided to FWS along with the BFC 2014 Petition). This admission makes it clear that FWS failed to meet even the most basic standard of reviewing a petition—to consider "the information provided within the four corners of the petition." *Id.* This admission alone requires a summary remand of FWS's 2019 Finding.

To put into context how this admission came to be, it is necessary to recall that where parties have petitioned FWS to list a species under the ESA, normally the information included in the petitions is "necessarily a part of the administrative record." *Am. Wildlands v. Norton*, 193 F. Supp. 2d 244, 251 (D.D.C. 2002). More generally, however, a complete administrative record consists of all documents and materials directly or indirectly considered by the agency. *Maritel, Inc. v. Collins*, 422 F. Supp. 2d 188, 196-97 (D.D.C. 2006) (citing *Bar MK Ranches v. Yuetter*, 994 F.2d 735, 739 (10th Cir. 1993)).

15

Here, FWS originally compiled an administrative record containing only the sixty-two sources referenced in the 2019 Finding, excluding from the record some sixty-two documents that were cited and relied upon in the BFC 2014 Petition. *See* Exhibits 1 at 2-3, 2 at 1, 3 at 2- of the Dec. of Michael R. Harris ("Harris Decl."). During negotiations, FWS at first refused to add these documents for two reasons. First, because the references "were not considered, directly or indirectly, by the decisionmaker." *Id.,* Ex. 2 at 2. Second, FWS also claimed that it did not receive electronic copies of the references cited in the Petitions. *Id.* However, at least for the BFC 2014 Petition, this statement is false, and importantly, misinterprets the law as it applies in this case. The regulation requiring petitioners to submit electronic or hard copies of supporting materials cited in the petition (50 C.F.R. § 424.14(c)(6)) was not finalized until September 2016 nor effective until October 2016, well after the 2014/15 Petitions were submitted. *See* Revisions to the Regulations for Petitions, 81 Fed. Reg. 66,461 (Sept. 27, 2016); *see also* USFWS 1-61 (BFC 2014 Petition submitted in November 2014); USFWS 62-390 (Horsley 2015 Petition submitted in March 2015). Moreover, these documents were submitted along with the BFC 2014 Petition. Harris Decl., Ex. 3 at 1-2. Indeed, the record dispute was ultimately resolved when FWS eventually "determined that some, though not all" references in the BFC 2014 Petition "appear to have been submitted to FWS with the Petition." *Id.*

However, as a result of this dispute, it has come to light that FWS has not met its statutory burden to "make a finding as to whether the petition presents substantial scientific or commercial information indicating that the petitioned action may be warranted" because FWS concedes that it did not directly or indirectly consider many of the references cited in the BFC 2014 Petition (and frankly the Horsley 2015 Petition as well). 16 U.S.C. § 1533(b)(3)(A); Harris Decl., Ex. 2 at 2. These studies provide important information in support of the BFC 2014 Petition and listing Yellowstone bison. FWS "failed

to consider an important aspect of the problem" by completely disregarding them. *State Farm*, 463 U.S. at 43.

**B. FWS's 2019 Finding is Arbitrary and Capricious Because it Failed to Correct the Deficiencies in The 2016 Finding Found in *Buffalo Field Campaign v. Zinke*.**

Even setting aside FWS's admission that it ignored a substantial amount of the information in the 2014/15 Petitions, the 90-day finding is further unlawful because: (1) FWS applied an improper heightened evidentiary standard by requiring the Petitions to present conclusive evidence; and (2) FWS improperly moved to resolve scientific disputes raised in the Petitions. *See Buffalo Field Campaign*, 289 F. Supp. 3d at 109-111. FWS has defined the "substantial scientific or commercial information" standard set forth in Section 4 of the ESA as "credible scientific or commercial information in support of the petition's claims such that a reasonable person conducting an impartial scientific review would conclude that the action proposed in the petition may be warranted." 50 C.F.R. § 424.14(h)(1)(i). The "substantial evidence" standard at the 90-day finding stage "is not a rigorous one." *Buffalo Field Campaign*, 289 F. Supp. 3d at 106. In fact, it is well established that at this stage, "[a] petitioner need not present 'conclusive evidence regarding' threats to a species." *Id.* (quoting *Humane Soc'y of the U.S. v. Pritzker*, 75 F. Supp. 3d 1, 14 (D.D.C. 2014)); *see also Ctr. for Biological Diversity v. Morgenweck*, 351 F. Supp. 2d 1137, 1140 (D. Colo. 2004) ("[T]he ESA does not require such conclusive evidence that listing is warranted to go to the next step."). The rationale behind this standard is that "[a]t the 90–day stage, the question is not whether the designation *is* warranted, only whether it *may* be." *Buffalo Field Campaign*, 289 F. Supp. 3d at 109 (emphasizes in original). Further, in making the 90-day finding, FWS is confined to the information contained in the petition or FWS's own files. *Id.* at 106; *see, e.g., Colo. River Cutthroat Trout v. Kempthorne*, 448 F. Supp. 2d 170, 175-76 (D.D.C. 2006).

The 90-day standard does not allow FWS "to simply discount scientific studies that support the petition or to resolve reasonable extant scientific disputes against the petition." *Buffalo Field Campaign*, 289 F. Supp. 3d at 110. While FWS need not "blindly accept statements in petitions that constitute unscientific data or conclusions, [or] information FWS knows to be obsolete," FWS must credit the supporting evidence unless it explains "why the scientific studies that the petition cites are unreliable, irrelevant, or otherwise unreasonable to credit." *Morgenweck*, 351 F. Supp. 2d at 1142; *Buffalo Field Campaign*, 289 F. Supp. 3d at 110. Notably, "[i]f reasonable scientists disagree—and one of those positions would indicate listing is warranted—a reasonable person could choose to agree with the scientist who supports the petition and, as a result, that listing may be warranted." *Buffalo Field Campaign*, 289 F. Supp. 3d at 109. Thus, "where there is disagreement among reasonable scientists, the Service should make the 'may be warranted' finding." *Id.* (quoting *Ctr. for Biological Diversity v. Kempthorne*, No. C 06-04186 WHA, 2007 WL 163244, at *7 (N.D. Cal. Jan. 19, 2007)); *see also Ctr. for Biological Diversity v. Kempthorne*, No. CV 07-0038-PHX-MHM, 2008 WL 659822, at *11-12 (D. Ariz. March 6, 2008).

In reviewing the 2016 Finding, Judge Cooper found that the case presents "a relatively straightforward example" of a disagreement between reasonable scientists. *Buffalo Field Campaign*, 289 F. Supp. 3d at 110. Namely, whether the Yellowstone bison DPS consists of two genetically distinct subpopulations and whether the 3,000-bison population target set by the IBMP is sufficient to ensure the survival of the Yellowstone bison DPS and its two subpopulations. *Id.* Judge Cooper explained that on the one hand, Halbert *et al.* 2012 and other studies suggest "that the [IBMP's] 3,000 bison population target for *both* herds is too low to ensure that *each* herd will survive." *Id.* On the other hand, White and Wallen 2012 argues that the target population of 3,000 for both herds is sufficient because "the two subpopulations are artificially created and management practices should not attempt to maintain them." *Id.* In its 2016 Finding, FWS ignored the Halbert study and adopted

18

White and Wallen's conclusion that FWS need not maintain the two subpopulations because "maintenance of subpopulation genetic differentiation and overall genetic diversity may not be crucial for preserving genes." *Id.* Judge Cooper concluded that FWS' adoption of White and Wallen "applied an inappropriately heightened standard" to the evaluation of the petition because FWS "offered no explanation for why Halbert et al.'s conclusion was irrelevant, unreliable, or unsubstantiated, nor any discussion why a reasonable person could not rely on the Halbert study over the White and Wallen study." *Id.*

Nothing has changed regarding the scientific evidence in the 2014/15 Petitions. More importantly, in issuing the 2019 Finding, FWS still refuses to address the strength of the evidence supporting Halbert *et al.'s* conclusion. Instead, FWS tries to rewrite the narrative as to how likely or not that conclusion is true. But just as with the 2016 Finding, such a determination is best left for after a more comprehensive status review, when FWS can gather additional evidence and input from outside contributors. It remains improper for FWS to resolve such issues in a 90-day finding.

1. **FWS unlawfully attempted to resolve disagreements among reasonable scientists regarding whether the Yellowstone bison DPS is comprised of two subpopulations.**

In the 2019 Finding, FWS tries yet again to ignore scientific evidence finding "[t]wo genetically distinct and clearly defined [Yellowstone bison] subpopulations . . . based on both genotypic diversity and allelic distributions." USFWS_002621. Nowhere in the 2019 Finding did FWS ever explain why the conclusions in Halbert *et al.* 2012 and the other studies were irrelevant, unreliable, or unsubstantiated, nor any discussion why a reasonable person could not rely on the Halbert study over the sources FWS relies on. *Buffalo Field Campaign*, 289 F. Supp. 3d at 110. FWS's failure to address this evidence dismisses the very bases set forth in the Petitions to list the Yellowstone bison DPS.

All of the threats to the continued survival of the bison set forth in the Petitions stem from the notion that the Yellowstone bison's genetic diversity is at risk because there is substantial evidence that the Northern and Central herds are actually two genetically distinct subpopulations. Accordingly, current management of the two subpopulations as one does not ensure long-term genetic viability and is causing the Central herd to experience disproportionate and dramatic population declines. The Petitions present ample evidence of such facts. *See, e.g.*, USFWS_002621-31 ("[t]wo genetically distinct and clearly defined subpopulations"); 003265 (documenting spatial separation of Yellowstone bison into two segments, the Northern and Central herds); 002092 (used non-invasive fecal DNA sampling and detected fine-scale population genetic structure among Yellowstone bison, suggesting female philopatry), 002395-96 and 002552-55 (studied DNA and found some level of genetic population subdivision within the Yellowstone bison population); 002940-42, 002983, and 003037 (geographic separation of Lamar, Pelican, and Mary Mountain segments into two breeding populations); *see also* USFWS_005321.

FWS did not evaluate evidence of subpopulation structure presented in these sources nor the related threats to the bison. Instead, FWS simply concludes that even though two genetically distinct lineages remain, those lineages are not clearly separated into two distinct herds and the lineage representing the original bison in Yellowstone National Park is no longer confined to the Central herd. USFWS_001493, 001495, and 001498. FWS only superficially addresses Judge Cooper's holding that the agency prematurely adopted the conclusions of White and Wallen 2012 that there may not be two subpopulations. USFWS_001497. Instead, it wrongly focuses on the unsupported assertion that "mixing between the two herds supports [the] conclusion that [Yellowstone] bison should be considered a single DPS, without further subdivision." USFWS_001498.

FWS purports to rely on five different sources to support this conclusion. USFWS_001497. Four of the sources relied upon in the 2019 Finding, however, do not

discuss or study the genetic makeup of the herds, and two sources are notably not peer-reviewed scientific studies. Geremia *et al*. 2014, which is peer-reviewed, does not discuss or study the genetic makeup of the two herds and solely relies on field observations to make its findings.[5] USFWS_002354. Fuller *et al*. 2007 is a peer-reviewed "research article" and it is not authoritative because it only suggests that "interchange **may be** occurring." USFWS_002082 (emphasis added). Geremia 2017 is an annual status report on the Yellowstone bison population and it contains no citations or references to any documents or scientific studies. USFWS_002378, 002386. White and Wallen 2012 is simply a two-and-a-half-page letter to the editor of *Journal of Heredity* critiquing the Halbert study. USFWS_003975-77. As the Halbert team of geneticists noted in response to the White and Wallen letter, the details of the movement and genetic studies relied upon for White and Wallen's unsupported conclusions are unpublished and are not peer-reviewed. *See* Natalie D. Halbert *et al*., *Yellowstone Bison Genetics: Let Us Move Forward*, 103 J. Hered. 754, 754-55 (2012), *available at* https://doi.org/10.1093/jhered/ess051. FWS erroneously relies on these sources and offers no explanation why a reasonable person could rely on these four sources and not on Halbert, which specifically studied the genetic makeup of the two herds.

The fifth source FWS cites is Forgacs *et al*. 2016, which is the only scientific study FWS relies on that actually evaluates the bison's genetic makeup. *See* USFWS_002056-70. The Forgacs study did not find evidence of population subdivision; however, it did find "two independent and historically important lineages." USFWS_002056, 002063. FWS implies that Forgacs somehow refutes Halbert's finding and thus, the bison population levels are acceptable and should be managed as one population. However, Forgacs never states nor implies that it refutes Halbert. Instead, Forgacs specifically states that the

---

[5] As a practical matter, even if some members of one herd have been observed in the location of another herd, two genetically distinct subpopulations can still exist. Observations of physical mixing do not provide scientific evidence on the actual genetic makeup of the two herds.

reasons for Halbert and Forgacs' conflicting conclusions "could be due to differences in the structure and function of the genomic regions analyzed, the differences in mutation rates, and the sensitivities of the statistical tests used." USFWS_002063. In addition, the Forgacs study does not encourage FWS to manage the two herds as one. Instead, it explicitly states that "[b]efore new management standards and policies are defined for the Yellowstone bison population, additional studies involving population structure and genetic diversity based on both mtDNA and nuclear genetic diversity assessments **need** to be conducted." USFWS_002065 (emphasis added).

There are many reasons why the two studies could have resulted in different conclusions. For example, the objective of Forgacs was to "better characterize and understand haplotype frequencies in Yellowstone bison" and assess overall genetic health to determine if the Yellowstone bison DPS carried a hypothesized, detrimental mitochondrial DNA. USFWS_002058, 002064. This differs from the objective of Halbert, which was specifically to "investigate genetic substructure within the Yellowstone National Park bison population." USFWS_002621. In addition, the Halbert and Forgacs studies rely on different tests and methods. The Halbert study evaluated microsatellites of nuclear DNA, which is DNA inherited equally from both parents, whereas the Forgacs study evaluated spatial analysis of mitochondrial DNA (mtDNA), which is DNA passed from the female to her offspring with little or no variation (and thus would be expected to show less variation between subpopulations). USFWS_002621-23, 002063. Moreover, the studies used different sample sizes. Forgacs "assessed mitochondrial genomes from 25 randomly selected Yellowstone bison" whereas Halbert assessed microsatellite genotypes from 661 bison. USFWS_002056, 002623. These few examples of the multitude of varying factors in scientific research are exactly why FWS should give the studies a more thorough review during 12-month status review instead of resolving this outstanding scientific dispute at the 90-day finding stage.

In any case, FWS's attempt to resolve the possible inconsistencies between Halbert and Forgacs is flatly inconsistent with the objectives of a 90-day finding and deprives both scientists (and others) from the opportunity to chime in on these issues as part of a 12-month status review. This is what the ESA requires, and is what FWS has done in the past when presented with a similar scientific dispute as the one presented here.

For example, a petition to delist the Preble's meadow jumping mouse ("PMJM") presented evidence that "suggest[ed]" the PMJM "may be" genetically the same as a non-threatened species and thus improperly designated as a threatened subspecies. 90-Day Finding for a Petition to Delist the Preble's Meadow Jumping Mouse in Colorado and Wyoming and Initiation of a 5-Year Review, 69 Fed. Reg. 16,944, 16,945 (Mar. 31, 2004). At the 90-day stage, FWS did not attempt to determine whether the study was correct or incorrect and instead found the study "should be evaluated" and the petition presented "substantial information" that delisting may be warranted. *Id.* Notably, after issuing the 90-day finding, FWS was presented with a conflicting study concluding the PMJM was properly designated as a genetically distinct subspecies. 12-Month Finding on Two Petitions to Delist the Preble's Meadow Jumping Mouse, 78 Fed. Reg. 31,679, 31,681 (May 24, 2013).

During the 12-month status review, "in order to rectify the conflicting conclusions of two studies," FWS reopened the comment period and assembled an outside "panel of experts to carefully review and assess the studies." *Id.* The panelists "reviewed, discussed, and evaluated all of the literature relevant to PMJM's taxonomy, including published literature, unpublished reports, third-party critiques, public comments, and other materials suggested by interested parties." *Id.* at 31,685. The panel also "examined and reanalyzed the raw data . . . including the mtDNA data, microsatellite DNA data, and original sequence chromatograms (automated DNA sequence data output recordings)." *Id.* The panel found that the study concluding that the PMJM was a subspecies was more accurate than the

23

other study and thus, FWS found that the PMJM did not warrant delisting. *Id.* at 31,680, 31,686.

FWS should treat the disputed studies in the present case like it did in the PMJM case. This case again "presents a relatively straightforward example" of a disagreement between reasonable scientists concerning subpopulations of the Yellowstone bison. *Buffalo Field Campaign*, 289 F. Supp. 3d at 110. By relying on Forgacs and the other sources, FWS once again attempts to resolve a disagreement among reasonable scientists. *Id.* at 110-12. Notably, some of the sources at issue here are the exact same sources discussing the exact same scientific disputes at issue in the 2018 case. *Id.* at 110 (Halbert concluding there are two genetically distinct subpopulations versus White and Wallen arguing the two subpopulations are artificially created). FWS inexplicably disregarded petitioners' evidence when Judge Cooper explicitly stated that to apply the proper standard at the 90-day stage, FWS "must explain why the evidence supporting the petition is unreliable, irrelevant, or otherwise unreasonable to credit rather than simply pick and choose between contradictory scientific studies." *Id.* at 112. FWS, once again, failed to explain why Halbert and the other studies providing evidence of two genetically distinct subpopulations are "unreliable, irrelevant, or otherwise unreasonable to credit." *Id.* at 110.

### 2. FWS unlawfully attempted to resolve disagreements among reasonable scientists regarding whether a 3,000-bison population target is sufficient to ensure survival of the Yellowstone bison DPS.

FWS's 2019 Finding further seeks to resolve questions raised among reasonable scientists on whether the 3,000-bison population target for both the Northern and Central Yellowstone bison herd combined is sufficient to ensure survival of each individual herd. USFWS_001489-90. In this regard, Halbert *et al.* 2012 presents strong evidence for the existence of "[t]wo genetically distinct and clearly defined subpopulations" of bison within the Park. USFWS_002621; *Buffalo Field Campaign*, 289 F. Supp. 3d at 110. The Halbert

study combined with other studies cited in the Petitions "have suggested that around 3,000 bison are needed to ensure a herd's survival, . . . suggests that the [IBMP's] 3,000 bison population target for *both* herds is too low to ensure that *each* herd will survive." *Buffalo Field Campaign*, 289 F. Supp. 3d at 110 (emphases in original). Even so, FWS sided with the sources that concluded the 3,000-bison population target is sufficient without explaining why the Halbert study and other studies are "unreliable, irrelevant, or otherwise unreasonable to credit." *Id*.

The effective population sizes[6] for the two Yellowstone bison subpopulations are unknown, and a thorough population viability analysis (PVA) is needed to determine an appropriate effective population size for the long-term sustainability of the subpopulations. USFWS_002629. Even though the exact effective population sizes for the subpopulations are unknown and FWS declined to initiate a PVA, the Petitions present evidence of effective and census population sizes that could ensure the Yellowstone bison's survival. USFWS_000023-24, 000045-46, 001499.

It is undisputed that at least two herds exist. The 2019 Finding and Petitions cite Hedrick 2009, which states that "**individual herds or clusters**" should have an effective population size of 1,000 (census number of 2,000-3,000) "to avoid inbreeding depression and maintain genetic variation." USFWS_002645 (emphasis added); *see also* 003279 (conservation of high allelic diversity will require the maintenance of a population census size greater than about 3,250 and removal of mainly or only juveniles); 003289 (1,000–

---

[6] There is an important difference between effective population size and census population. Effective population size is the calculated number of individuals in a population who contribute offspring and their genes to the next generation, reconciled based on the assumption of equal genetic contributions for each male and female, which is not the case for harem-breeding animals like bison, which have an extremely skewed ratio of breeding males to breeding females. USFWS_000023-24; 003273-79. A census population, on the other hand, is the total number of individuals in a group. *Id.* The effective population size "is an important parameter for assessing genetic variability." USFWS_ 003273.

2,000 bison "likely are needed **in each of the central and northern breeding herds** to retain enough genetic diversity to enable bison to adapt to a changing environment through natural selection, drift, and mutation" (emphasis added)); 005963-65 (recommending a generalized minimum viable population of 5,000 adults to achieve long-term evolutionary and demographic conservation goals).

Even though a PVA should be conducted, the best available science discussing the effective population size demonstrates that the IBMP's population target of 3,000 for both herds is too low and the Yellowstone bison subpopulations are not large enough to maintain genetic viability. The most recent Yellowstone bison population estimates are a census size of 3,337 in the Northern herd and 1,190 in the Central herd. USFWS_001489. Thus, using the best available studies, the size of the Northern range herd is marginal, and the size of the Central range herd is far below an effective population size of 1,000 and census size of 2,000-3,000. Accordingly, the biologically significant Yellowstone bison subpopulations are below viability. USFWS_000023-24.

Instead of recognizing this substantial evidence, the 2019 Finding inexplicably and prematurely attempts to resolve disputes between conflicting scientific studies concerning the 3,000-bison population target. USFWS_001489-90. FWS simply concludes, without further analysis, that Halbert "does not recommend specific herd sizes." USFWS_001490. However, petitioners need not conclusively recommend a specific herd size for FWS to determine that a reasonable person could agree that a total census population of 3,000 is too low. The fact that Halbert does not recommend a specific herd size is irrelevant because the multiple studies presented in the Petitions conclude that a population target of 3,000 is too low to ensure the survival and genetic viability of each individual herd. FWS cannot ignore Halbert's conclusion that "[p]opulation subdivision is a critically important force for maintaining genetic diversity" and thus, the current management practices "warrant serious reconsideration." USFWS_002629.

In this regard, FWS again fails to explain why the scientific studies demonstrating that the 3,000-bison population target is too low to ensure survival of the two genetically distinct subpopulations are "unreliable, irrelevant, or otherwise unreasonable to credit." *Buffalo Field Campaign*, 289 F. Supp. 3d at 110. As such, the 2019 Finding is arbitrary and capricious because "the 90-day standard does not allow the Service to simply discount scientific studies that support the petition or to resolve reasonable extant scientific disputes against the petition." *Id.* at 111.

### C. The Petitions Present Substantial Scientific or Commercial Information that Listing the Yellowstone Bison DPS May Be Warranted.

#### 1. The Yellowstone bison DPS is endangered or threatened in its current range due to substantial loss of historic habitat and range.

The ESA requires FWS to list a species if it is in danger of extinction or likely to become in danger of extinction throughout all or a significant portion of its range. 16 U.S.C. § 1532(6), (20). Courts have held that the term "range" in the ESA is ambiguous and "traditional rules of statutory construction do not answer the question of whether 'range' means current or historical range." *See, e.g., Humane Soc'y of the U.S. v. Zinke*, 865 F.3d 585, 604 (D.C. Cir. 2017); *Ctr. for Biological Diversity v. Zinke*, 900 F.3d 1053, 1064-66 (9th Cir. 2018). Thus, courts defer to FWS's interpretation of "range" to mean the species' "current range" and not its "historical range." Final Policy on Interpretation of the Phrase "Significant Portion of Its Range" in the Endangered Species Act's Definitions of "Endangered Species" and "Threatened Species," 79 Fed. Reg. 37,577, 37,583 (July 1, 2014) ("Range Policy").

However, in *Humane Society*, the D.C. Circuit vacated FWS's rule to delist the gray wolf because FWS failed to analyze the possible consequences of significant loss of the species' historical range. 865 F.3d at 589, 606, 615. FWS explicitly states that "evaluating the effects of lost historical range on the viability of the species is an important component

of evaluating the current status of the species." Range Policy, 79 Fed. Reg. at 37,584.
Although the D.C. Circuit acknowledged that the ESA does not compel FWS to interpret
"range" to mean historical range, FWS cannot "brush off a substantial loss of historical
range as irrelevant to the species' endangered or threatened status." *Humane Soc'y*, 865
F.3d at 605. In fact, "a species may be 'endangered or threatened throughout all or a
significant portion of its current range *because* [a] loss of historical range is so substantial
that it undermines the viability of the species as it exists today.'" *Id.* at 605 (quoting FWS'
Range Policy, 79 Fed. Reg. at 37,584) (emphasis in original).

Requiring FWS to consider a species' loss of historical range is an "eminently
sensible approach" because range loss can "result[ ] in a species for which distribution and
abundance is restricted, gene flow is inhibited, or population redundancy is reduced to
such a level that the entity is now vulnerable to extinction or likely to become so within the
foreseeable future throughout all or a significant portion of its current range." *Humane
Soc'y*, 865 F.3d at 605-06 (quoting Range Policy, 79 Fed. Reg. at 37,584). In addition, "a
species with a reduced range is at greater risk of all or most of its populations being
affected by a catastrophic event such as a hurricane or fire." *Humane Soc'y*, 865 F.3d at 606
(quoting Range Policy, 79 Fed. Reg. at 37,584). Thus, "an adequate evaluation of the threats
confronting the survival of a species within its current range requires looking at more than
just the current moment in time," and FWS "also needs to consider the scope of the species'
historical range, and the impact that material contraction or relocation might indicate for
survival within a currently constricted or confined range." *Humane Soc'y*, 865 F.3d at 606;
*Ctr. for Biological Diversity*, 900 F.3d at 1064-66.

Here, FWS's 2019 Finding fails to analyze whether the Yellowstone bison's effective
extinction throughout a majority of its historical range constituted at least a threat of
curtailment throughout all or a "significant portion of its range." Instead, FWS simply notes
the migration patterns of the two subpopulations and "recognize[s] that range curtailment

28

due to the loss of migration routes and the lack of tolerance for bison beyond [Yellowstone National Park] boundaries has occurred." USFWS_001489. FWS further acknowledges that management actions taken pursuant to the IBMP, including culling, hunting, and hazing, "may exacerbate impacts from range curtailment." *Id*. Yet, FWS concludes without scientific explanation (let alone referencing the evidence in the Petitions) that population estimates "do not support an assertion that listing may be warranted due to range curtailment." USFWS_001489.

FWS's failure to analyze whether the loss of 85% of the Yellowstone bison's territory constitutes loss of a significant portion of its range and habitat is arbitrary and capricious and violates the ESA. It is undisputed that the Yellowstone bison's historical range was 7,720 square miles and its current range is 1,226 square miles and thus, Yellowstone bison currently only occupy 15% of their historic range. USFWS_001485, 001489. The 2019 Finding ignores the fact that the Yellowstone bison's population is effectively zero throughout a significant portion of its historical range. FWS also ignores the fact that the Yellowstone bison population remains low due to ongoing management preventing the bison from occupying its current range inside Yellowstone National Park and outside of the Park on the Custer Gallatin National Forest. FWS erroneously based its determination solely on alleged "stable" population numbers within this small remaining fragment of the Yellowstone bison's range and an estimated park-wide carrying capacity. *See Carlton v. Babbitt*, 900 F. Supp. 526, 533 (D.D.C. 1995) ("[E]ven if the FWS is correct that the grizzly population is stable, this does not necessarily imply that the stable population is large enough to withstand certain threats."). Thus, FWS's failure to consider the Yellowstone bison's loss of range is arbitrary and capricious because it represents a failure "to consider an important aspect of the problem." *State Farm*, 463 U.S. at 43.

**2. The 2019 Finding erroneously relied on the carrying capacity of the Yellowstone National Park.**

First, FWS claims Yellowstone bison may not be endangered or threatened by substantial habitat loss and range curtailment because the current population levels are less than the carrying capacity for Yellowstone National Park and "[a] reasonable and scientifically defensible herd size for [Yellowstone] bison should be less than carrying capacities for individual herds as well as less than the estimated carrying capacity park-wide."[7] USFWS_001490. However, carrying capacity is not the best scientific measure to determine whether a species is endangered or threatened by loss of range and habitat. Instead, FWS should have considered and relied on the best science of minimum viable population (MVP) and credible population viability estimates presented in the Petitions.

The MVP is the smallest number of individuals required for a population to survive in its natural environment. USFWS_005962. An MVP is calculated through population viability analyses (PVA), which are "stochastic systems models which project changes in population abundance over time and account for demographic and environmental variation, catastrophic events, density dependence and inbreeding depression analyzes." *Id.* "MVP estimates bring scientific frankness to the socio-political arena." USFWS_005965.

In this case, the carrying capacity only estimates the number of Yellowstone bison that Yellowstone National Park forage can sustain, which is notably only 15% of the Yellowstone bison's historical range. The MVP and other population estimates assess the number of Yellowstone bison required for the bison to actually survive in the already restricted area of the Yellowstone National Park. In other words, carrying capacity does not equal survivability because even if a species reaches its' carrying capacity in a small portion

---

[7] "Ecological carrying capacity has been defined as the natural limit of a population set by resources in a particular environment." USFWS_003284. In other words, "the carrying capacity of a biological species in a particular habitat refers to the maximum number of individuals (of that species) that the environment can carry and sustain, considering its geography or physical features." *Carrying capacity*, Biology Online, https://www.biologyonline.com/dictionary/carrying-capacity (last visited Nov. 16, 2020).

of its historical range, that species could still be endangered or threatened because the minimum population size is far too low for that species to actually survive in a restricted range. In fact, FWS itself has said that even if a species "had reached carrying capacity in some parts of [the state], those areas represent[ed] a comparatively small portion of the original range of the species, and population density alone will not assure long-term welfare." *Humane Soc'y of the U.S. v. Jewell*, 76 F. Supp. 3d 69, 83 (D.D.C. 2014) (internal quotation omitted). Thus, a "reasonably scientifically defensible herd size" is based on the MVP or other credible population viability estimates and not, as FWS claims, on "carrying capacity."

Here, the Petitions present substantial evidence that the target population of 3,000 is too low to ensure survival of both herds combined. *See* USFWS_000044-45; *supra* 24-27. The 2019 Finding erroneously claims that "[a] wide range of MVP estimates have been derived specifically for bison in [Yellowstone National Park]." USFWS_001490. As explained above, "a detailed [PVA] was not conducted to determine the [MVP] size for either the entire population or its genetically different subpopulations." USFWS_000043. Although scientists have concluded that a thorough PVA should be conducted "[t]o determine the appropriate effective population size for the long-term sustainability of the subpopulations," FWS declined to initiate a PVA. USFWS_002629; USFWS_001499.

Sources that FWS claims are MVPs derived specifically for the Yellowstone bison are not MVPs. Dratch and Gogan 2010, Jones and Roffee 2008, and Freese *et al.* 2007 are not scientific studies that calculate the MVP for Yellowstone bison in Yellowstone National Park. USFWS_001887, 002696, 002076. Instead, these sources consist of reports, review articles, and recommendations of bison population sizes without considering the size needed for individual herds or subpopulations. *Id.* Plumb *et al.* 2009 is a recommendation of the Yellowstone bison population based on Yellowstone National Park's carrying capacity and other factors such as "long-term interests of stakeholders." USFWS_003289.

31

Although not an MVP, FWS misrepresents Hedrick 2009 by implying that Hedrick recommends a census population size of 2,000-3,000 for both herds, however, Hedrick explicitly states that "**individual herds or clusters**" should have an effective population size of 1,000 (census number of 2,000-3,000) "to avoid inbreeding depression and maintain genetic variation." USFWS_002645 (emphasis added). Thus, FWS's claim that "[a] wide range of MVP estimates have been derived specifically for bison in [Yellowstone National Park]" is false. USFWS_001490.

In addition to misrepresenting Hedrick and ignoring the population viability estimates discussed above, FWS ignores the only two peer-reviewed scientific studies in the administrative record (discussed in the BFC 2014 Petition) that actually calculate an MVP, which are Traill *et al.* 2007 and Traill *et al.* 2010. USFWS_000045. The Traill studies recommend a "generalized minimum viable population of 5,000 to achieve long-term evolutionary and demographic conservation goals." USFWS_000045, 005953, 005963-65. Instead of acknowledging Traill as the best available MVP along with the other relevant population viability estimates, FWS uses carrying capacity and unreliable population estimates as a measure to determine that the Yellowstone bison may not be endangered or threatened by substantial loss of range and habitat. USFWS_001490. The IBMP's minimum conservation threshold of 2,100 and population target of 3,000 are substantially below the 5,000 MVP suggested by Traill. USFWS_000045.

In addition, the most recent Yellowstone bison population estimates are a census size of 3,337 in the Northern herd and 1,190 in the Central herd. USFWS_001489. Thus, using the best available studies above, the size of the Northern herd is marginal, and the size of the Central range herd is clearly far below an effective population size of 1,000 and census size of 2,000-3,000. *See supra* 24-27. Accordingly, the biologically significant Yellowstone bison subpopulations are below viability. USFWS_000023-24.

FWS also fails to explain why Traill and the other population estimates are "unreliable, irrelevant, or otherwise unreasonable to credit." *Buffalo Field Campaign*, 289 F. Supp. 3d at 110. Instead, FWS defends its' position by claiming the Yellowstone bison may not be endangered or threatened by loss of range and habitat because their population levels are below Yellowstone National Park's carrying capacity. However, carrying capacity is not a surrogate for conserving biodiversity, ecological processes, or natural variation. Carrying capacity is about year-to-year forage production, not evolutionary adaptation in the wild, and is only one factor among many that may endanger or threaten Yellowstone bison in time frames of 100 years or more. Thus, by relying on carrying capacity instead of MVP and other credible population estimates for each individual herd, FWS disregards evidence supporting the Petitions and fails to explain why the evidence is not credible. Accordingly, FWS's reliance on carrying capacity is arbitrary and capricious because it "runs counter to the evidence before the agency." *State Farm*, 463 U.S. at 43.

Second, by relying on Yellowstone National Park's carrying capacity for bison, FWS effectively limits the bison's migratory range and habitat to Yellowstone National Park. USFWS_001489-90, 001493, 001495. Throughout the 2019 Finding, FWS calls the Yellowstone bison the "Yellowstone National Park" or "YNP" bison even though the bison currently lives "**in and around**" the Park and the bison's range extend to areas outside of Yellowstone National Park, including areas in the Custer Gallatin National Forest. USFWS_001484 (emphasis added). Both the Northern and Central herds migrate outside the northern boundary lines of Yellowstone National Park during fall, winter, and spring calving. USFWS_000037, 001489, 002349, 004069-72 (maps of seasonal distribution and migration). Additionally, a portion of the Central herd migrates outside the western boundary lines of the Yellowstone National Park during fall, winter, and spring calving. *Id.* FWS cannot ignore a substantial part of the bison's range. At minimum, FWS should have

33

considered loss of bison calving grounds from government hazing and trapping in its analysis of lost range and habitat.[8]

Third, FWS's estimates regarding carrying capacity and historic population sizes are inaccurate. FWS erred in relying on the Keigley 2018 study published by the Society of Range Management to conclude bison may have exceeded carrying capacity, and recent population estimates are "4X greater than historical estimates" to support its' ultimate conclusion that "recent population estimates for [Yellowstone] bison do not support an assertion that listing may be warranted due to range curtailment." USFWS_001489-90, 002911-13; 002968. Keigley heavily relies on studies that trace back to Meagher's 1973 population estimate, which is based on spotty records from settlers on numbers and distribution through 1902 when "bison everywhere verged on extinction." USFWS_002968-69. FWS ignored evidence that "[i]n almost no case prior to 1880 . . . does the written historical record provide the means of calculating any herd size for any locale." USFWS_005835. Thus, FWS's claim that the Yellowstone bison population "increased over the past few decades to levels that have no historical precedent" is inaccurate and is not based on the best available science. USFWS_001489.

---

[8] In fact, Yellowstone bison were also never historically confined to Yellowstone National Park. FWS ignores evidence in the Petitions that "bison appear to have been living everywhere in Greater Yellowstone where habitats were suitable." USFWS_005835. FWS cannot restrict analysis of the bison's range to Yellowstone National Park just because FWS, the State of Montana, and the National Park Service want the bison to stay within the boundaries of the Park. The Yellowstone bison's historical range reaches far beyond the boundaries of the Park and at no point in the ESA listing process may FWS consider political and economic factors in discounting range and habitat. 16 U.S.C. § 1533(b)(1)(A) (all listing determinations must be made "**solely** on the basis of the best scientific and commercial data available" (emphasis added)). If the Yellowstone bison population becomes larger than the carrying capacity of the Park, the bison could presumably reoccupy more of its historical range in the Greater Yellowstone Ecosystem. Thus, there is no reason why the FWS should solely base its ESA analysis on the confines of the Yellowstone National Park.

FWS should have considered the Yellowstone bison's loss of habitat and migration corridors to human developments and ongoing loss of range under the IBMP. Instead, the Service inappropriately picks and chooses inaccurate historic "population estimates," and misrepresents viable population sizes to conclude that herd size should be less than the "carrying capacity" of the Park. USFWS_001489-90. Thus, FWS's 2019 Finding is arbitrary and capricious because it "runs counter to the evidence before the agency." *State Farm*, 463 U.S. at 43.

### 3. FWS's conclusion that the IBMP may be an adequate source of regulatory protection is contrary to the evidence provided in the Petitions.

The ESA requires FWS to determine whether a species may be endangered or threatened due to "the inadequacy of existing regulatory mechanisms." 16 U.S.C. § 1533(a)(1)(D). When considering the inadequacy of existing regulatory mechanisms, "the question is whether the existing regulatory mechanisms are inadequate to prevent a species that is presumably decreasing in population from becoming threatened, endangered, or even extinct." *Rocky Mountain Wild v. U.S. Fish & Wildlife Serv.*, No. CV-13-42-M-DWM, 2014 WL 7176384, at *10, (D. Mont. Sept. 29, 2014). Thus, "the 'adequacy' of a regulation is tied to the level, or even existence, of any threat the regulation is designed to meet." *Id.* (citing 16 U.S.C. § 1533(a)(1)(D)).

Moreover, while the D.C. Circuit has determined that an "existing regulatory mechanism" does not necessarily need to be legally binding, the conservation efforts considered in a management plan must be both "sufficiently certain and effective to alleviate a threat of endangerment" and "sufficiently certain to be implemented." *See Defs. of Wildlife v. Zinke*, 849 F.3d 1077, 1082-84 (D.C. Cir. 2017) Thus, state management plans are only adequate regulatory mechanisms "if they work." *Crow Indian Tribe v. United States*, 965 F.3d 662, 680 (9th Cir. 2020). And in that regard, they must work to ensure, among other things, the "long-term genetic health" of the petitioned species. *Id.* at 679-80.

Here, Yellowstone bison management inside and outside the Yellowstone National Park is governed by the IBMP. However, "the IBMP was not designed to protect bison and their habitat but rather to keep bison <u>out</u> of their habitat outside of the Park." USFWS_000042. In the 2019 Finding, when FWS had the opportunity to critically evaluate the IBMP under Factor D, FWS instead irrationally concluded that since it did not find the Petitions presented substantial information indicating listing may be warranted under Factors A, B, C, or E, then there is not substantial information indicating inadequate regulatory mechanisms. USFWS_001498. FWS ignores the substantial evidence in the Petitions demonstrating that the Yellowstone bison may be endangered or threatened due to the inadequacy of the IBMP for multiple reasons throughout multiple listing factors. USFWS_000041-46. FWS failed to consider the evidence of regulatory inadequacies in the 2019 Finding.

First, the IBMP goals are inadequate to provide for the conservation of the Yellowstone bison. *Id.* Yellowstone bison are a DPS comprised of at least two genetically distinct subpopulations. *See* USFWS_002621. The IBMP ignores the bison's population substructure and instead manages the Northern and Central subpopulations as a single population. USFWS_ 000045, 002629. The IBMP seeks to maintain the Yellowstone bison at a total census population target of 3,000 but allows the population to fall as low as 2,100 before the agencies will initiate any conservation measures. USFWS_003882. The 3,000-bison population target is actually "a spring population limit" because if the population reaches over 3,000 the government may capture, quarantine, or slaughter the bison. USFWS_003880, 003900.

To preserve the genetic diversity of Yellowstone bison, managers must guard against the deleterious effects of genetic drift, inbreeding, and demographic and environmental stochasticity by maintaining an effective population size of 1,000 interbreeding individuals for **each** subpopulation, resulting in a census size of 2,000-3,000

bison per subpopulation. USFWS_002645; 000023-24, 000044-45. Both the IBMP's 3,000 and 2,100 population thresholds fall tremendously short of the best available science for maintaining the recommended minimum effective and census population sizes and thus, do not adequately protect the Yellowstone bison. *Id.*; USFWS_000041-46. In addition, "[t]he minimum conservation threshold defined by the IBMP is less than half the minimum viable population recommendations suggested by current analyses." USFWS_000045. The 2019 Finding failed to consider that none of the IBMP's conservation population thresholds would sufficiently minimize the rate of loss of bison genetic diversity. USFWS_001498.

Moreover, contrary to FWS's assertions, the IBMP's population thresholds are not based on the best available science and instead, "have been arbitrarily determined without an in-depth analysis of the population ecology of Yellowstone bison." USFWS_000043; *See* 000023-24, 000040-46; 001499. "The IBMP cited no peer-reviewed publications regarding bison population demographics that support the population thresholds established and a detailed population viability analysis was not conducted to determine the minimum viable population size for either the entire population or its genetically different subpopulations." USFWS_000043. Instead, the IBMP used models that "were insufficient for assessing long-term, detrimental effects of brucellosis risk management operations to population viability and genetic effective population size." *Id.* Further, the original environmental impact statement for the IBMP is outdated and there has been no action to update the scientific basis for management of the Yellowstone bison. *See* Environmental Impact Statement for a Management Plan for Yellowstone-Area Bison, 80 Fed. Reg. 13,603 (Mar. 16, 2015).

In addition, the models used in the IBMP to determine population thresholds were inadequate because they did not consider a time frame of 100 years or more. USFWS_000043. FWS dismissed this concern by reasoning that "[w]hen forecasting population trends, we limit our estimates of foreseeable future to . . . 75 years, based on typical climate projections." USFWS_001499. However, the models used in the IBMP "ran

for only 18 years which is only approximately three bison generations, and results were presented for just 15 years or the life of the IBMP." USFWS_000043. This falls substantially short of FWS's own foreseeable future of 75 years. FWS also failed to consider how the lack of a population viability analysis affects the adequacy of the IBMP.

Second, FWS ignores the disproportionate effects of culling caused by the IBMP. Since the IBMP does not recognize the two genetically distinct subpopulations, the IBMP contains no program to monitor the rate of culling to each herd and it is unclear if managers know which herd members are being trapped for slaughter on any given day. USFWS_000045. The Petitions present substantial evidence that "culls differentially affected breeding herds and altered gender structure, created reduced female cohorts, and dampened productivity." *Id.*; 002629, 003970-71 (discussing the many negative effects of large-scale culling inside Yellowstone National Park). In addition, disproportionate culling "could result in the loss of entire maternal lineages, decrease genetic effective population size, and an overall loss of genetic diversity among the Yellowstone bison." USFWS_000045. In fact, FWS concedes that the Central herd's population decline is at least partially due to disproportionate culling targeting this herd. USFWS_001492-93. Nevertheless, FWS failed to even consider how the IBMP lacks a mechanism to address disproportionate culling that may endanger or threaten the Yellowstone bison DPS.

Third, the IBMP does not consider "the combined synergistic effects of disease risk management operations, demographic stochasticity, and environmental stochastic events (e.g. severe winter mortality or disease outbreak) on Yellowstone bison population viability and genetic diversity." USFWS_000042. FWS recognizes this concern, but inexplicably dismisses it stating that "the threshold of 2,100 is more than twice historical estimates of bison population in [Yellowstone National Park]" and that the Yellowstone bison population size "has remained at approximately twice the threshold number, despite regular, intensive culling." USFWS_001499. As explained above, the historic population

estimates FWS relies on are inaccurate and not based on the best available science. *See supra* 34-35. In addition, historic population estimates do not specify the current population size needed to maintain population viability, nor the population size needed for each subpopulation to maintain genetic diversity for the foreseeable future.

FWS's conclusion that the Petitions do not present substantial evidence that the Yellowstone bison may be endangered or threatened by inadequate regulatory mechanisms is arbitrary and capricious. FWS failed to consider the substantial information demonstrating that the IBMP population thresholds are not based on the best available science, and that the IBMP has no mechanisms in place to maintain the genetic diversity and population viability of the Yellowstone bison DPS and its two subpopulations. Thus, FWS's finding that the IBMP may be an adequate regulatory mechanism is arbitrary and capricious because it is "without scientific basis." *Crow Indian Tribe*, 965 F.3d at 679.

### 4. The Petitions present substantial information that Yellowstone bison are threatened by hunting and culling.

FWS's conclusion that the Petitions do not present substantial evidence that Yellowstone bison may be endangered or threatened under Factors B and C from overutilization, including aggressive overhunting and culling under the IBMP is arbitrary and capricious because it is unsubstantiated and contrary to the evidence. 16 U.S.C. § 1533(a)(1)(B)-(C). The Petitions present substantial evidence demonstrating that aggressive over-hunting and culling may be adversely affecting the demographic and genetic makeup of the herds and potentially impairing their future genetic health and viability. USFWS_000037-41.

First, as an initial matter, the IBMP allows bison to be hazed, captured, and slaughtered when they migrate to their current winter range inside the Park in addition to being hunted, hazed, and captured outside the Park on the Custer Gallatin National Forest. USFWS_003900. The petitions present substantial evidence that the Central herd bison

may be disproportionately affected by hazing, hunting, and culling because they migrate both westward and northward from the Park and are therefore susceptible to population loss at both boundaries. USFWS_000037, 002349. Whereas population loss for the Northern herd only occurs at the northern boundary. *Id.* Indeed, FWS acknowledges that the annual culling and hazing of Yellowstone bison in Yellowstone National Park and on the Custer Gallatin National Forest has a significant impact on the population. USFWS_001492-93. In fact, it is undisputed that the Central herd's population decline is at least partly caused by "disproportionate culls" of bison from the Central herd. USFWS_001492.

Second, the Petitions present substantial evidence that the Central herd bison may be disproportionately affected by hunting because when they attempt to occupy their territory outside the northern and western Park boundaries, the declining Central herd is hunted in both areas and thus, clearly bear "the brunt of the hunting take." USFWS_000037. FWS never disputes the evidence demonstrating that hunting disproportionately affects the Central herd, but it reasons that "the numbers of bison removed by hunting are only a small portion" of the "several thousand" Yellowstone bison culled. USFWS_001493. However, in an already small and declining population, the disproportionate hunting combined with disproportionate culling has severe detrimental effects on the bison. "It is irrefutable that population size matters for extinction risk, with small and isolated populations being particularly vulnerable" to many threats. USFWS_005962. FWS cannot ignore the evidence before it.

Third, the Petitions present substantial evidence that disproportionate hunting, hazing, capture, and slaughter adversely and disproportionately impacts the two genetically distinct subpopulations of Yellowstone bison. USFWS_000037. Hunting and culling may impair the ability of Yellowstone bison to maintain viable effective population sizes and reduce the health, resilience, and defining characteristics of the herds. USFWS_000037-45. FWS acknowledges the BFC 2014 Petition studies that "refer to the loss

40

of genetic diversity and maternal lineages due to disproportionate culling of the [Yellowstone National Park] bison from the central herd." USFWS_001493. However, FWS offered no explanation why these studies were "irrelevant, unreliable, or unsubstantiated." *Buffalo Field Campaign*, 289 F. Supp. 3d at 110 Thus, at the very least, the Petitions present substantial credible evidence that listing the Yellowstone bison as endangered or threatened may be warranted due to overutilization.

FWS attempts to justify its position by disingenuously concluding that "total" or "overall numbers of bison are stable despite culling and the presence of brucellosis and are approaching the carrying capacity of [Yellowstone National Park]." USFWS_001493. The population of the Central herd is undeniably declining and unstable and FWS cannot ignore this evidence. *Defs. of Wildlife v. Babbitt*, 958 F. Supp. 670, 683-84 (D.D.C. 1997) (finding that FWS unlawfully ignored evidence demonstrating that hunting is a significant threat to the species). The fact that the total population has remained "stable" despite multiple threats and inadequate management does not indicate that Yellowstone bison are not in danger of extinction throughout all or a significant portion of its range. *See Carlton v. Babbitt*, 900 F. Supp. 526, 533 (D.D.C. 1995) ("[E]ven if the FWS is correct that the grizzly population is stable, this does not necessarily imply that the stable population is large enough to withstand certain threats."). Thus, FWS's conclusion that the Petitions do not present substantial evidence that the Yellowstone bison may be endangered or threatened is arbitrary and capricious because it fails to articulate "a rational connection between the facts found and the choice made" and is contrary to the evidence before it. *State Farm*, 463 U.S. at 43.

Finally, FWS's 2019 Finding ignored substantial evidence demonstrating that elk are the primary source of transmission of brucellosis to cattle and thus, culling bison is unnecessary and ineffective. It is undisputed that there have been no confirmed cases of brucellosis transmission from bison to cattle in the wild and that "recent research indicates

41

that elk may be the primary source of transmission to livestock due to more co-mingling of elk and livestock." USFWS_000040, 001494-95. Yet, the primary "intent" of killing the Yellowstone bison "is to minimize the risk of brucellosis transmission to domestic cattle" grazing on National Forest and private lands. USFWS_001492. Although FWS mentions elk in two places, in neither section does FWS analyze the issue of whether bison are being unreasonably targeted by the government in ranges where elk are free to roam. USFWS_001492-93, 001495. FWS's failure to consider the rationale and basis for killing bison is arbitrary and capricious because it "entirely failed to consider an important aspect of the problem." *State Farm*, 463 U.S. at 43.

5.   **The Petitions present substantial evidence that the Yellowstone bison DPS may be threatened or endangered by climate change.**

The ESA requires FWS to determine whether a petition presents substantial evidence that a species may be endangered or threatened due to "other natural or manmade factors affecting its continued existence," including climate change. 16 U.S.C. § 1533(a)(1)(E); *see, e.g., Greater Yellowstone Coalition, Inc. v. Servheen*, 665 F.3d 1015, 1025 (9th Cir. 2011). The Petitions present substantial evidence that Yellowstone bison may be endangered or threatened by climate change including, decreased precipitation, increased temperatures, widespread drought, and reduced snowpack, which poses a serious threat to the genetic integrity of the species as a whole. USFWS_000048-49.

FWS dismisses this evidence by claiming that "[p]lains bison exhibit flexibility regarding climate conditions." USFWS_001498. However, just because Yellowstone bison could possibly migrate to climates similar to that of Mexico or Canada does not mean that there is suitable habitat or range available or that the bison will be permitted to migrate across those ranges. FWS did not evaluate how the DPS of Yellowstone bison will maintain genetic diversity under a rapidly changing climate. FWS failed to address substantive evidence and instead claimed that no information in the Petitions "suggests climate change

**will occur** to an extent that [Yellowstone] bison will be negatively impacted within the foreseeable future." USFWS_001498 (emphasis added). However, FWS cannot force petitioners to provide specific and conclusive evidence where none is required by the statute. 16 U.S.C. § 1533(b)(3)(A) (only requiring substantial information that the petitioned action may be warranted).

Finally, FWS mentions the Martin 2018 study, without further analysis. USFWS_001498, 002924. The Martin study found that as temperatures increase from climate change bison body mass will become smaller. USFWS_001498, 002924. But, FWS entirely failed to consider the time frame in which bison must adapt body mass in response to rapidly rising temperatures. The greatest recorded decline in bison body mass of 26% occurred over a 3,000-year period (325 to 1,080 generations). USFWS_002925. Current climate change projects that bison body mass must decline 46% in an 80-year period (8–26 generations). *Id.* Thus, FWS's conclusion that the Petitions failed to present substantial evidence that Yellowstone bison may be endangered or threatened by climate change is arbitrary and capricious because FWS ignored the evidence before it. *State Farm*, 463 U.S. at 43.

## CONCLUSION AND REMEDY REQUESTED

FWS's 2019 Finding is arbitrary and capricious and riddled with legal and factual errors. The fate of the Yellowstone bison should not be determined based on FWS's haphazard review of the Petitions and unsubstantiated 2019 Finding. Petitioners submitted the BFC Petition in 2014 and now, six years later, FWS has still failed to issue a proper and legally sound 90-day finding. It is clear that the Petitions, at the very least, present substantial information that the Yellowstone Bison may be endangered or threatened under the ESA, which meets the low evidentiary threshold to support a positive 90-day finding. In addition, there are clear and significant scientific disputes that must be resolved after thorough consideration of all the evidence during the 12-month status review.

Plaintiffs respectfully request that at minimum, this Court vacate the 2019 Finding and remand the Petitions back to FWS for further review. Moreover, because FWS has twice attempted and failed to issue a proper 90-day finding, we request that remand come with an order to make a new 90-day finding within 90 days. Every unlawful and failed attempt leaves the Yellowstone bison without legal protections and vulnerable to numerous threats. The Yellowstone bison should not be placed at risk due to FWS's failure to understand and properly apply the law.

It is fair and equitable for this Court to order FWS to proceed with a 12-month status review. Here, there has already been a six-year delay and FWS has repeatedly (but procedurally improperly) commenced the type of analysis that properly belongs in a 12-month status review. This remedy has been provided by the D.C. District Court on at least one occasion before. In *Colo. River Cutthroat Trout v. Kempthorne*, 448 F. Supp. 2d 170, 178 (D.D.C. 2006), this Court reasoned:

> [O]rdering a full status review is the only fair and equitable remedy in the posture of this case. The agency did undertake a 90-day review (albeit, belatedly), but the 90-day review undertaken impermissibly looked beyond the material in the Petition. In effect, it constituted the beginning of a status review that must be completed, after public notice and a comment period, with input from all interested parties. Given the more than four-year delay in the FWS's issuance of the first, flawed, 90-day Finding, it would be inequitable and inappropriate to require the plaintiffs to start the administrative process all over again by filing a new petition.

*Id.* (citing *Ctr. for Biological Diversity v. Morgenweck*, 351 F. Supp. 2d 1137, 1144 (D. Colo. 2004) (ordering defendants to complete a full 12-month status review after holding that its 90-day finding went beyond the review mandate)).

The decision of this Court is of immense importance and will have real effects on the future of the Yellowstone bison. Accordingly, Plaintiffs respectfully request that this Court set aside FWS's 2019 Finding and direct FWS to initiate a 12-month status review to determine whether listing the Yellowstone bison DPS is in fact warranted.

Dated: November 16, 2020

Respectfully submitted,

*/s/ Michael R. Harris*
Michael Ray Harris (DC Bar No. CO0049)
Director, Wildlife Law Program
Friends of Animals
7500 E. Arapahoe Road, Suite 385
Centennial, CO 80112
Tel: 720.949.7791
Fax: 888.236.3303
michaelharris@friendsofanimals.org

**CERTIFICATE OF SERVICE**

I certify that on November 16, 2020, the foregoing has been electronically filed with the Court's electronic filing system, which will generate automatic service upon all Parties enrolled to receive such notice.

Dated: November 16, 2020                    Respectfully submitted,

*/s/ Michael R. Harris*
Michael Ray Harris (DC Bar No. CO0049)
Director, Wildlife Law Program
Friends of Animals
7500 E. Arapahoe Road, Suite 385
Centennial, CO 80112
Tel: 720.949.7791
Fax: 888.236.3303
michaelharris@friendsofanimals.org

46